**Mark O. HATFIELD, Governor of the State of Oregon, et al., Appellants,**

v.

**Paul R. BAILLEAUX et al., Appellees.**

**No. 16877.**

United States Court of Appeals
Ninth Circuit.

April 11, 1961.

---

Robert Y. Thornton, Atty. Gen., Lloyd G. Hammel, Peter S. Herman, Asst. Attys. Gen., for appellant.

Cecil H. Johnson, Salem, Or., Louise Jayne, and William E. Love, Portland, Or., for appellees.

Stanley Mosk, Atty. Gen., of California, Doris H. Maier, Deputy Atty. Gen., for State of California, as amicus curiae.

Before HAMLEY and MERRILL, Circuit Judges, and WOLLENBERG, District Judge.

HAMLEY, Circuit Judge.

This is a suit by seven inmates of Oregon State Penitentiary to enjoin prison officials from enforcing certain prison regulations and continuing certain customs and usages at the penitentiary. The regulations, customs and usages in question limit the times and places during and in which inmates may engage in legal research and the preparation of legal papers, and restrict the acquisition and retention of law books and legal materials. Plaintiffs alleged that they are thereby deprived of reasonable access to the courts in violation of their rights under the First and Fourteenth Amendments of the Constitution.

Jurisdiction of the district court was invoked under the Civil Rights Act.[1] Named as defendants were the Oregon governor, secretary of state and state treasurer, comprising The Oregon State Board of Control, and the warden and deputy warden of the penitentiary.

The question of the necessity for a three-judge court, as provided for in 28 U.S.C.A. § 2281, was raised by motion filed by defendants. Responsive to this motion an order was entered directing a trial "on all issues on which counsel for the plaintiffs and defendants agree will not require the convening of a three-judge court."[2]

The cause then proceeded to trial without apparent limitation as to the issues raised by the amended and consolidated complaint. Judgment was entered granting a substantial part of the relief sought.[3] The judgment was made appli-

---

1. The civil rights statutes specifically invoked were 28 U.S.C.A. § 1343(3) and 42 U.S.C.A. §§ 1983, 1985(2) and (3).

2. If, however, there had been issues presented in the original proceedings which would have required the convening of a three-judge court and such issues were not withdrawn, the single district judge would have been without jurisdiction to deal with other issues, though standing alone they would not have required a three-judge court. See Wolf v. Boyd, 9 Cir., 287 F.2d 520.

3. Defendants were thereby enjoined from:
 (1) prohibiting plaintiffs not in isolation from utilizing their cell time not otherwise committed for the purpose of studying law and preparing legal documents pertaining to their respective criminal matters including pending prosecutions and legality of the judgments and sentences under which they were individually confined;
 (2) prohibiting plaintiffs from purchasing or receiving legal materials pertaining to their respective criminal matters, whether or not in book form and without regard to source;
 (3) prohibiting plaintiffs from keeping in their respective cells their individual legal materials and legal papers pertaining to their respective criminal matters, subject to reasonable restrictions as to quantity if applicable to both legal and nonlegal materials;
 (4) prohibiting plaintiffs while confined to the isolation ward from communicat-

cable to all inmates of the penitentiary. The opinion of the district court is reported in 177 F.Supp. 361. Defendants appeal.

Appellants and appellees now share the view that it was not necessary to convene a three-judge court to try this case. We agree.

■■ Where the effort is to enjoin the enforcement, operation or execution of an administrative order of general application representing considered state policy, an attack on the constitutionality of such an order calls section 2281 into play.[4] But the orders here challenged, while promulgated pursuant to authority conferred by statute,[5] are not of general state-wide application and do not represent state policy.[6]

Before reaching the merits of the appeal, we must also deal with appellants' contention that the entire proceeding has been rendered moot by the enactment, effective May 26, 1959, of the Oregon Post Conviction Hearing Act, ORS 138.-510 to 138.680.

Appellants argue that the gravamen of appellees' amended and consolidated complaint is that they have to act as their own counsel and cannot do so effectively under the challenged prison regulation.

They point out that under the Oregon Post Conviction Hearing Act now in effect provision is made for the appointment of counsel for indigent prisoners who wish to pursue that remedy. They also assert, citing 28 U.S.C.A. §§ 1915, 2250, that in so far as federal court proceedings involving the validity of state imprisonment are · concerned, appointment of counsel for indigent prisoners may also be obtained.

The Oregon Post Conviction Hearing Act does not provide a remedy available to every Oregon state prisoner who seeks release. It does not apply to those who are defending against pending criminal charges, or who are appealing from judgments of conviction. Nor does it apply to those who have asserted their grounds for and been denied relief in post-conviction proceedings prior to the passage of the act. Alcorn v. Gladden, 9 Cir., 286 F.2d 689.

■■ In so far as federal habeas corpus proceedings are concerned, indigent state prisoners are not entitled to court-appointed counsel unless under the circumstances of the particular case this is required in order to attain due process of law. Anderson v. Heinze, 9 Cir., 258 F.2d 479, 481. And as to both state and

---

ing with or receiving communications from legal counsel or judges pertaining to their respective criminal matters;

(5) prohibiting plaintiffs while confined to the isolation ward from having a reasonable opportunity to study legal materials and prepare legal documents pertaining to their individual criminal matters, having due regard for the purpose of isolation treatment;

(6) confiscating legal documents and materials found outside specific areas designated by defendants, but their right to invoke other usual and customary disciplinary sanctions if prison rules were violated was preserved.

4. Alabama Public Service Commission v. Southern R. Co., 341 U.S. 341, 343 note 3, 71 S.Ct. 762, 95 L.Ed. 1002; Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 292, 43 S.Ct. 353, 67 L.Ed. 659; 1 Moore, Federal Practice (2d ed. 1959) par. 0.205.

5. Under ORS 421.015 the warden is authorized to make and prescribe rules for the government of the convicts, subject to the approval of The Oregon State Board of Control. The general orders here in question, as listed below, were prepared under the supervision of the warden and were submitted to and approved by the board: Gen.Order No. 8, dated May 7, 1958, "Visiting and Mail Regulations"; Gen.Order No. 12 (revised), dated April 30, 1958, "Regulations Governing the Operation of the Segregation and Isolation Unit"; Gen.Order No. 14 (revised), dated June 11, 1958, "Regulations Governing Handling and Distribution of Inmates' Mail"; Gen.Order No. 60 (revised), dated March 1, 1957, "Reading Material"; Gen.Order No. 66, dated June 2, 1955, and Gen.Order No. 66 (revised), dated August 20, 1958, "Conduct of Inmate Legal Affairs."

6. See Rorick v. Board of Com'rs, 307 U.S. 208, 212–213, 59 S.Ct. 808, 83 L.Ed. 1242, and cases there cited.

federal court proceedings, a state prisoner may competently and intelligently waive counsel and represent himself if he chooses to do so, and is not obliged to be represented by counsel. See White v. Ragen, 324 U.S. 760, 762, note 1, 65 S.Ct. 978, 89 L.Ed. 1348.

■ It follows that enactment of the Oregon Post Conviction Hearing Act has not rendered moot this action to enjoin practices which are alleged to deprive appellees of reasonable access to state and federal courts in proceedings involving personal liberty.

Coming to the merits, it is first necessary to establish the substantive basis for the judgment. Jurisdiction in the district court is based on 28 U.S.C.A. § 1343(3), which is a provision of the Civil Rights Act.[7] It will be noted that under this provision a district court has jurisdiction only to the extent that civil actions to redress the rights referred to therein have been "authorized by law." It is therefore necessary to look elsewhere to ascertain what civil actions for the redress of these rights have been authorized by law.

Appellees relied upon 42 U.S.C.A. §§ 1983 and 1985(2) and (3) as providing authorization for the bringing of this particular civil action. These, too, are provisions of the Civil Rights Act.

Section 1985(2) and (3) pertains only to actions for deprivations of rights by acts pursuant to a conspiracy to interfere with civil rights. Hoffman v. Halden, 9 Cir., 268 F.2d 280, 292. The district court judgment here under review

is not based upon any finding of conspiracy. On the contrary, the court specifically found and adjudicated that appellants did not unlawfully conspire to deprive the appellees of their right to have effective access to the courts to litigate and resolve criminal matters affecting them. It follows that the judgment is not based upon section 1985(2) and (3).

■ This leaves for examination 42 U.S.C.A. § 1983, the one remaining statute relied upon by appellees as providing a substantive foundation for the judgment. Under that statute one deprived under color of state law of any right, privilege or immunity secured by the Constitution and laws of the United States may obtain redress in the federal courts.[8]

■ Reasonable access to the courts is such a right, being guaranteed as against state action by the due process clause of the fourteenth amendment. In so far as access by state prisoners to federal courts is concerned, this right was recognized in Ex parte Hull, 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034. The right of access by state prisoners to state courts was recognized in White v. Ragen, supra, 324 U.S. at page 762, note 1, 65 S.Ct. at page 979.[9]

The theory of appellees' case is that the prison regulations and practices in question, whether or not designed to this end, have the effect of depriving appellees of the right of reasonable access to the courts. The district court adopted this theory in entering judgment for appellees.

7. 28 U.S.C.A. § 1343 (Supp.1960) reads:
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
* * * * *
"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; * * *."

8. 42 U.S.C.A. § 1983 reads:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

9. See also Egan v. Teets, 9 Cir., 251 F.2d 571, 576.

Appellants argue that the district court erred in granting relief on this ground. They contend that under the evidence and findings before us the conclusion is not warranted that the prison regulations and practices in question have the alleged unconstitutional effect.

In the context of this case, access to the courts means the opportunity to prepare, serve and file whatever pleadings or other documents are necessary or appropriate in order to commence or prosecute court proceedings affecting one's personal liberty, or to assert and sustain a defense therein, and to send and receive communications to and from judges, courts and lawyers concerning such matters. Whether or not in a particular case the access afforded is reasonable depends upon all of the surrounding circumstances.

There is no finding that appellants have been denied all access to the courts.[10] There is no finding that by reason of any prison regulation or practice pertaining to the preparation, service and filing of such pleadings or documents, or to the sending and receiving of such communications, any appellee has ever lost the right to commence, prosecute, defend or appeal in any court proceeding involving personal liberty. Nor is there any finding that by reason of prison regulations and practices any appellee has been substantially delayed in obtaining a judicial determination in any such court proceeding.

In the absence of findings of this kind it is difficult to see how there could possibly be warrant for the conclusion that appellees have been deprived of reasonable access to the courts.

But passing for the time being this basic weakness in the premise upon which the judgment rests, we turn to an examination of the factual and legal bases for the individual injunctive provisions of the judgment.

One provision relates exclusively to appellees confined to the isolation ward. Appellants are enjoined from prohibiting these appellees from communicating with or receiving communication from legal counsel or a judge of an appropriate court pertaining to criminal matters affecting them. Appellants are also enjoined from prohibiting appellees confined in isolation from having a reasonable opportunity to study legal materials and prepare legal documents pertaining to such criminal matters, "having due regard for the purpose of isolation treatment."

With regard to this provision of the judgment the court in effect found that while confined in isolation appellees are not permitted to send or receive communications to and from attorneys, judges and courts except in cases already pending, and then only in the discretion of the warden or one of his deputies. The court also found that appellees while confined in isolation are not permitted access to legal materials, documents or papers.

The periods of confinement in isolation are of relatively short duration.[11] Con-

---

10. Nor would the evidence support such a finding. The depositions of the appellees herein show that each of the six appellees had instituted two or more state or federal court proceedings after becoming Orgon state prisoners. The records of our court, of which we take judicial notice, show that at least four of the appellees have had access to this court since becoming inmates of Oregon State Penitentiary. In re Oregon ex rel. Sherwood v. Gladden, 9 Cir., 240 F.2d 910, 911, one of the appellees herein made the same contention concerning access to the courts, and this court noted that the petition itself disclosed that Sher-

wood had not been denied an opportunity to file complaints or petitions with various courts. For instances in which petitions alleged facts constituting a complete denial of access, see Dowd v. United States ex rel. Cook, 340 U.S. 206, 71 S. Ct. 262, 95 L.Ed. 215; Cochran v. State of Kansas, 316 U.S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453.

11. Appellees in this case suffered the following periods of confinement in isolation: Bailleaux, 5 days; Anderson, 5 days; Williams, 5 days in January 1958, 5 days in March and 2 days in September 1958; Taylor, 27 days; Barber, 8

finement in isolation, the court found, is imposed only for violations of the prison rules and regulations. There is no attempt in imposing such confinement to discriminate against persons engaged in legal work. Nor is such confinement arbitrarily imposed in any other respect. There is no finding that any appellee has ever been confined in isolation under conditions which, as to safety or health, warranted immediate court relief therefrom.

■ In view of these facts and circumstances, we do not believe that the court was warranted in concluding that because of the restrictions. imposed during isolation, as described above, appellees have been deprived of reasonable access to the courts.

The remaining injunctive provisions of the judgment relate to appellees who are a part of the general prison population or are confined in the segregation ward. These provisions are summarized in subparagraphs (1) to (3) and (6) in footnote 3.

Concerning these provisions of the judgment, the court found that appellees who are a part of the general prison population spend approximately fourteen hours each day confined in their cells. They are permitted to keep in their cells a specified quantity of study materials other than legal materials. These may include books, magazines, courses of study, including correspondence courses, and personal papers. These inmates are permitted to prepare nonlegal documents in their cells. They are also permitted to write letters in their cells, including letters to courts, judges and attorneys. They

may also retain in their cells' correspondence from courts, judges and attorneys providing such correspondence does not contain written citations of legal authority.

Appellees who are a part of the general prison population are not allowed to engage in the study of law or to prepare legal documents during such times as they are confined in their cells. Nor are they allowed to keep documents, materials and papers of a legal nature in their cells. All papers, documents and materials of a legal nature found outside the prison library are confiscated by prison officials as contraband.

Preparation of legal documents by those who are a part of the general prison population is confined to the prison library, which is open approximately thirty hours a week. During the periods when the library is open a limited number of prisoners, by appointments obtained in advance, are permitted to work there on legal matters. Each individual library appointment is for approximately three hours.[12]

When this suit was commenced only four inmates could use the law library facilities at any given time. Occasional delays of more than three or four days and up to seventeen days occurred between the time an appointment was sought and the time use of the facilities was actually obtained. By the time of the trial the capacity of the prison library had been increased to eleven persons, and no delays in excess of one day in obtaining use of those facilities were being experienced.[13]

days; Sherwood, numerous and varied periods in isolation since 1954 with no single confinement exceeding 16 or 17 days.

12. Prisoners employed in special jobs are, from a practical standpoint, further restricted in the use of the law library when available periods coincide with work hours. Absence from a job assignment may result in an unfavorable work report, which in turn adversely affects a prisoner's "good time" credit.

13. Appellees in this case used or had available to them the following approximate periods in the law library: Richard E. Williams, 1,000 hours during the period from February 27, 1957, to October 31, 1958; Paul R. Bailleaux, 540 hours during the period from September 11, 1957, to October 31, 1958; and James Quentin Anderson, 351 hours during the period from January 11, 1957, to October 31, 1958. Appellee George R. Barber had no complaint relative to the prison law library. Appellees Earl Sherwood and

At the time this action was brought the prison law library consisted solely of two volumes of Corpus Juris Secundum, portions of the Oregon Revised Statutes, and some advance sheets from the Oregon Supreme Court. By the time of the trial, however, there had been a substantial increase in the prison library, as indicated by the inventory set out in the margin.[14]

Under prison regulations inmates are not permitted to purchase, acquire or receive bound law books of any kind at any time. They are not permitted to obtain, acquire or receive any legal materials from any source other than law publishers. The only such materials which may be obtained are copies of individual cases or excerpts from statutes, the cost of which may be prohibitive to inmates.

Appellees confined in the segregation ward do not have access to the law library. They are, however, permitted to engage in legal research or the preparation of legal documents in their cells from approximately 8:30 a. m. to approximately 3:30 p. m. seven days a week. Only during these periods are they permitted to have legal documents, materials or papers in their cells.

The court found that the regulations and practices described above were applied not only to appellees but to all prison inmates similarly situated.

While the court did not enter findings as to the purpose of these regulations and practices, the evidence is undisputed as to those purposes. Most of these regulations and practices are for the purpose of discouraging the informal practice of law by what were termed "cell-house lawyers." Prison officials testified that if permitted to engage in such practice, aggressive inmates of superior intelligence exploit and dominate weaker prisoners of inferior intelligence. The practice also tends to develop a group of inmate leaders, which is discouraged in all institutions.

With regard to inmates in segregation the regulations have a similar purpose but are designed to take into account the fact that such inmates do not have access to the library. Hence they are permitted to have legal materials in their cells and work on legal matters therein for stated hours each day. The setting of specific hours when this may be done is to enable the same guards to distribute and pick up each prisoner's legal materials, thereby avoiding confusion.

The reason prisoners are not permitted to purchase bound law books and keep them in the library is the inadequacy of the library facilities and personnel to take care of such acquisitions. The reason for the regulation limiting the acquisition of legal materials from any source other than the publisher or the public officer having custody thereof is quite different.[15] All incoming mail and packages must be examined to exclude reception of contraband. It is the view of prison officials that where the enclosures come from a source such as a publishing house or public office, the need for such scrutiny and the likelihood of contraband being delivered to inmates is minimized.

In this federal proceeding under the Civil Rights Act we are not concerned with the question of whether these purposes for the challenged regulations are salutary or whether the regulations provide an effective means of achieving

Andrew Taylor, both in segregation, studied in their cells.

14. The United States Constitution Annotated; Corpus Juris Secundum, Evidence (2 volumes), Criminal Law (3 volumes), Constitutional Law (2 volumes) and Witnesses (2 volumes); Oregon Revised Statutes, ch. 34, Writs, ch. 131–149, procedure in criminal matters generally, ch. 156–157, procedure in criminal action in district and justice courts, ch. 161–169, Crimes and Punishment; Advance Sheets, Supreme Court of Oregon.

15. While the court found that the only permissible source of such materials was the publisher, the evidence is uncontradicted that legal documents could also be received from official custodians of such documents.

such purposes. See Ex parte Hull, 312 U. S. at page 549, 61 S.Ct. at page 641. If the purpose was not to hamper inmates in gaining reasonable access to the courts with regard to their respective criminal matters, and if the regulations and practices do not interfere with such reasonable access, our inquiry is at an end. The fact, if it be a fact, that access could have been further facilitated without impairing effective prison administration is likewise immaterial.

■ This accords with the general principle that, apart from due process considerations, the federal courts have no power to control or supervise state prison regulations and practices.[16] This circuit has on several occasions given application to this principle.[17]

That reasonable access is afforded the inmates at Oregon State Penitentiary seems to us to be self-evident. As stated earlier in this opinion, whatever the conditions may have previously been, at the time of the trial inmates who were a part of the general prison population were experiencing no more than one day's delay in obtaining access to the library. Every time they went to the library they had about three hours in which to work on legal matters. The very substantial amount of hours appellees spent at the library even before its enlargement is summarized in footnote 13. Those inmates who are confined in the segregation

ward are allowed forty-nine hours a week, or approximately 2,600 hours a year, in which to study law and prepare legal documents in their cells.

The time thus afforded would appear to be adequate for the purpose of preparing complaints, petitions or applications in which the inmate desires to test the legality of his confinement on any ground which he initially has in mind. This is true because such pleadings are to be factual in content and the inclusion therein of legal argument is not only inappropriate but detracts from the effectiveness of the presentation.[18]

The time afforded for law study would also seem to be adequate if the inmate desired to search the law books in the hope that some defect in the judgment or sentence, not originally appreciated, would reveal itself. It would likewise seem to be sufficient if the purpose were to prepare a brief in support of the inmate's position in some pending case.

■ But if not adequate for these latter purposes, no constitutional problem would be presented. State authorities have no obligation under the federal Constitution to provide library facilities and an opportunity for their use to enable an inmate to search for legal loopholes in the judgment and sentence under which he is held, or to perform services which only a lawyer is trained to perform. All inmates are presumed to

---

16. It was pointed out in United States ex rel. Atterbury v. Ragen, 7 Cir., 237 F.2d 953, 955, that federal courts have an extremely limited area in which they may act pertaining to the treatment of prisoners confined in state penal institutions. Likewise in United States v. Jones, 5 Cir., 207 F.2d 785, 786, it was said that the federal government has no power to control or regulate the internal discipline of the state penitentiaries.

17. Oregon ex rel. Sherwood v. Gladden, supra note 10, 240 F.2d at page 911; Stroud v. Swope, 9 Cir., 187 F.2d 850,

851–852, certiorari denied 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627; Taylor v. United States, 9 Cir., 179 F.2d 640, 643; Numer v. Miller, 9 Cir., 165 F.2d 986.

18. As one of the appellees herein was told by this court in Oregon ex rel. Sherwood v. Gladden, supra note 10, 240 F.2d at page 912:

"If petitioner were given an opportunity to study some law, one of the things he would learn would be that a petition for a writ of habeas corpus properly contains allegations of fact alone, and that legal arguments are not a proper part thereof."

be confined under valid judgments and sentences. If an inmate believes he has a meritorious reason for attacking his, he must be given an opportunity to do so. But he has no due process right to spend his prison time or utilize prison facilities in an effort to discover a ground for overturning a presumptively valid judgment.

 Inmates have the constitutional right to waive counsel and act as their own lawyers, but this does not mean that a non-lawyer must be given the opportunity to acquire a legal education. One question which an inmate must decide in determining if he should represent himself is whether in view of his own competency and general prison regulations he can do so adequately. He must make the decision in the light of the circumstances existing. The state has no duty to alter the circumstances to conform with his decision.

 Underlying the conclusions stated above is the fact, not to be overlooked, that inmates of a penitentiary are undergoing punishment for crimes of which they have been convicted. "Lawful incarceration," as the Supreme Court said in Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356, "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."

We have also taken into consideration the power of the courts to deal on a case by case basis with specific claims that reasonable access is being denied. As Judge Pope pointed out for this court in State ex rel. Sherwood v. Gladden, supra, 240 F.2d at page 912, relief of this kind was accorded when Chessman v. Teets, 9 Cir., 239 F.2d 205, a habeas corpus proceeding, was pending in the district court.

The judgment is reversed and the cause is remanded with directions to dismiss the proceedings.