**UNITED STATES of America ex rel. John WAKELEY**

v.

**COMMONWEALTH OF PENNSYLVANIA et al.**

Misc. No. 3029.

United States District Court
E. D. Pennsylvania.

Sept. 22, 1965.

John Wakeley, in pro. per.

James C. Crumlish, Jr., Dist. Atty. of Philadelphia County, Philadelphia, for respondent.

JOHN W. LORD, District Judge.

This is an equity action in which plaintiff, a state prisoner, seeks to enjoin certain prison officials from denying him access to legal materials and facilities. The action is brought under the Civil Rights Act, 42 U.S.C.A. § 1983 and under 28 U.S.C.A. § 1343 which collectively confer jurisdiction on the District Courts to redress deprivations of civil rights.

Plaintiff is presently serving a sentence of from ten to twenty years under a 1963 second degree murder conviction. He asserts that he was unlawfully convicted, but that he has been prevented from effectively contesting it by the officials at Graterford, a Pennsylvania State Correctional Institution, where he is confined. Specifically, he complains that he has been denied the use of a law library and that he has been prevented from acquiring legal materials—including books, newspapers, and other publications—from sources other than those enumerated in the margin.[1] Plaintiff further asserts that his communication even with these enumerated sources has, on occasion, been thwarted.

Before examining the merits of plaintiff's contentions, however, this Court must deal with another matter raised in the complaint and answer. Plaintiff states that he contacted the Assistant

---

1. Bureau of Correction current policy is that opinions may be secured from the issuing court, the United States Government Printing Office and West Publishing Company. Any other legal material (magazine and newspaper articles, law reviews, etc., may be obtained from the official source, provided the inmate specifies the particular article. Entire books are to be made available but removed from the inmates' cells when their legal actions are concluded. Letter from Superintendent David N. Myers, August 9, 1965; Defendants' answer to complaint.

Superintendent and that he conferred with another prison official before filing his complaint. The defendants assert that prison regulations prescribe a more detailed procedure than this.[2] Thus at the outset we must determine whether it was necessary for plaintiff to first exhaust this procedure.

## I. Exhaustion of Administrative Remedies

The Supreme Court of the United States has consistently recognized and adhered to the rule that administrative proceedings must be exhausted prior to resort to judicial relief. This is especially so with regard to administrative remedies available to the states.[3] However, with regard to questions of civil rights it has long been established that the ordinary requirements of exhaustion do not apply. In Lane v. Wilson, 307 U.S. 268, 274, 59 S.Ct. 872, 875, 83 L.Ed. 1281 (1939), a landmark civil rights case, the United States Supreme Court, through Mr. Justice Frankfurter, said:

> To vindicate his present grievance the plaintiff did not have to pursue whatever remedy may have been open to him in the state courts. Normally, the state legislative process, sometimes exercised through administrative powers conferred on state courts, must be completed before resort to the federal courts can be had. * * * But the state procedure open for one in the plaintiff's situation * * * has all the indicia of a conventional judicial proceeding * * *. Barring only exceptional circumstances, * * * resort to a federal court may be had without first exhausting the judicial remedies of state courts.

Moreover, the Supreme Court recently went one step further and repudiated the requirement of exhaustion of even administrative remedies in certain actions brought under the Civil Rights Act. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). There the petitioners, negro students in an Illinois public school, brought suit under the Act in protest to alleged discriminatory school enrollment practices. The District Court dismissed the complaint on the ground that petitioners had failed first to exhaust their administrative remedies,[4] and the Court of Ap-

---

2. "THAT, Respondent avers that each and every inmate upon his arrival * * * is provided with an 'Inmate Handbook' which enumerates our complete rules and regulations. * * * 'If any problem arises within the institution concerning your confinement, you may bring the matter to the attention of the Classification and Treatment Clinic which has been established to help you with all types of personal problems. In addition, it is your privilege to address a communication at anytime to the Superintendent, the Deputy Commissioner of Correction, or the Commissioner of Correction, and as a final appeal, to the Attorney General.'" It has already been concluded in this District and Circuit that these regulations constitute proper administrative remedies. See Gaito v. Prasse, 312 F.2d 169, 171 (3rd Cir. 1963); United States ex rel. Mayberry v. Prasse, 225 F.Supp. 752, 754 (E.D.Pa.1963).

3. Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947); See also Alabama Public Service Comm'n v. Southern R.

Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) where the court said: " * * Equitable relief may be granted only when the District Court, in its sound discretion exercised with the 'scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts,' is convinced that the asserted federal right cannot be preserved except by granting the 'extraordinary relief of an injunction in the federal courts.' Considering that '[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies,' the usual rule of comity must govern the exercise of equitable jurisdiction by the District Court * * *". Citations omitted.

4. Under the Illinois statute (Ill.Rev.Stat. 1961, c. 122, § 22–19) a specified percentage of residents of a given school district could petition the superintendent of Public Instruction alleging racial segregation in the public schools. A hearing would be scheduled, with notice to the school board, after which the superin-

peals affirmed. McNeese v. Board of Education, Etc., 305 F.2d 783 (7tl. Cir. 1962). In reversing, the Supreme Court reviewed in part the purposes of the Act, and, speaking through Mr. Justice Douglas, said: "We would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court." (id. 373 U.S. 672, 83 S.Ct. 1436).

Thus at least with respect to some actions under the Civil Rights Act, it is clear that exhaustion of even administrative remedies is now a requirement of the past. In the light of these decisions, however, this Court is now confronted with the task of determining whether this principle of non-exhaustion was intended to spill over into every action brought under the Civil Rights Act.

■ After careful deliberation, this Court is convinced that it was not intended, and indeed could not have been contemplated, that the requirement be eliminated in all Civil Rights cases. Whatever the conclusion to which academic logic might lead, we are guided not by logic but by experience.[5] To waive the requirement of exhaustion of administrative remedies in this type of case would fly in the face of the experience of the law. Thus while a purely logical parallel might be drawn between the present case and the Illinois public school case, experience compels the conclusion that waiver of administrative exhaustion in the matter at hand would go far beyond the intendment of the United States Supreme Court. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

This is not to say that the United States Supreme Court was unjustified in relieving the litigants of part of their heavy burdens in the two great civil rights cases heretofore discussed, the McNeese Case (supra), and the earlier Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). For as applicable to those cases, and too many others like them, the doctrine of exhaustion was being deformed to subject constitutional guarantees to the mercy of an adverse social climate. The salutary doctrine was being used to thwart justice, defeating its function as a valuable incident to the American judicial system.[6]

■ The amelioration exemplified in the two Supreme Court cases was not a new approach to the protection of minority groups. The Civil Rights Act itself, and especially the section under which the present action is brought, was intended primarily to overcome sectional reluctance to uphold the rights of negroes.[7] It was designed, and has been used, " * * * to wipe out every form of racial distinction that had any form of legal support."[8] As recently as 1961 the Supreme Court had occasion to refer to the circumstances which led to its enact-

tendent would decide whether the allegations were meritorious, and then request the Attorney General to bring suit. Petitioners never attempted to utilize this procedure. (See 199 F.Supp. 403).

5. Holmes, The Common Law 5 (Howe ed. 1963): " * * * the life of the law is not logic: it is experience."

6. "The 'exhaustion' doctrine is a product of judicial self-limitation resembling the requirement of equity jurisdiction—that a litigant has no standing in equity where he has an adequate remedy at law—although matters of comity and need for orderly administrative procedure helped shape the doctrine." (See United States v. Fritz Properties, 89 F.Supp. 772, 777 (N.D.Calif.1950).

7. § 1 of the Civil Rights Act of 1866, re-enacted Act of May 31, 1870, 16 Stat. 140, was later divided into two sections, §§ 1977 and 1978, which presently constitute 42 U.S.C.A. §§ 1981 and 1982. Today's 42 U.S.C.A. § 1983 finds its antecedent in § 1 of the Act to Enforce the Provisions of the Fourteenth Amendment, 17 Stat. 13 (1871). See People of State of New York v. Galamison, 342 F.2d 255, 260 (2nd Cir. 1965).

8. Konvitz, A Century of Civil Rights (1962) at p. 63. A cursory examination of any compilation of cases under the Act attests that racial discrimination was the primary evil of the Act was intended and used to remedy. See e.g., 42 U.S.C.A. 1981, et seq. and especially 42 U.S.C.A. § 1983, n. 135.

ment. Speaking for the Court, Mr. Justice Douglas said:

> It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies. Monroe v. Pape, 365 U.S. 167, 180, 81 S.Ct. 473, 480, 5 L.Ed.2d 492 (1961).

It has not been the experience of this Court that complaints by inmates of state correctional institutions have been frustrated by any such "prejudice, passion and neglect."

■ However, fully apart from the foregoing, the view of this Court is supported by the statutes themselves. It should be noted that a number of similar provisions of Title 42 of the U.S.C.A. contain express exclusions of the necessity of prior resort to state judicial or administrative remedies.[9] But, no such exclusion is contained in the section under which the present action is brought.

Accordingly, this Court therefore concludes that inmates of state correctional institutions must, before invoking the aid of the Civil Rights Act, first exhaust their administrative remedies or make a satisfactory showing that they were in fact unable to do so.

It is arguable that the present plaintiff failed to exhaust his administrative remedies. Certainly he did not literally exhaust his remedy by proceeding to the final stage, an application to the Attor-

ney General of the Commonwealth of Pennsylvania.

On the other hand, it is not as if plaintiff merely consulted a minor prison official before filing his complaint. He alleges, and it is not denied, that he made numerous unsuccessful efforts to obtain from the assistant superintendent the relief he now seeks; and that he was on one occasion advised by the prison authorities that it would be useless for him to appeal further. Thus the petition raises certain questions of fact as well as law as to whether, prior to the institution of the present action, there was substantial exhaustion of available remedies. The question is not reached, however, since—for reasons to appear—the cause of action must fall on the merits. Even were it to be shown that petitioner had satisfied the prerequisite of exhaustion, his cause would not be advanced—since it is fatally defective in other respects.

## II. State Prisoner's Right of Access to Legal Materials and Facilities

On the merits, plaintiff asserts that he is denied the use of a law library, and that he is prevented from acquiring legal materials from sources other than those specified by the prison authorities. In essence, however, plaintiff's complaint is that he has been denied access to the courts in violation of the due process clause of the Fourteenth Amendment.

■ After careful consideration, it is the opinion of this Court that plaintiff's constitutional rights have not been infringed. We have long since passed that stage in the history of our country when the convicted felon was considered a "slave of the state".[10] However, as the Supreme Court said in 1948: "Lawful

---

9. See 42 U.S.C.A. § 1971 (e) (voting rights) ; 42 U.S.C.A. § 2000a (public facilities).

10. "He [the convicted felon] has, as a consequence of his crime, not only forfeited his liberty, but all his personal rights except those which the law in its humanity accords to him. He is for the time being the slave of the State." See Ruffin v.

Commonwealth, 62 Va. (21 Gratt.) 790, 796 (1871) quoted in Note, 110 U. of P. Law Rev. 985 (1961–62). See also People v. Russell, 245 Ill. 268, 91 N.E. 1075 (1827) where the Supreme Court of Illinois added this thought: "there follows, from the judgment (of conviction) a loss of civil rights, * * *. He has become an alien in his own country * * *."

incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Federal courts will not interfere with uniformly applied prison regulations designed to achieve the discipline indispensable to the orderly operation of a state penal institution.[11] Hence prison mail may be legitimately censored;[12] the exercise of even the most venerable of rights—freedom of religion—may be circumscribed when it poses a threat to internal discipline;[13] access to the courts in civil damage actions may be denied or suspended during confinement;[14] and so on *ad infinitum*. With these general pronouncements there can be no quarrel. Prison discipline *is* essential and certain rights *must* be curtailed in order to achieve it. But somewhere alone the line there exists a still finer line that separates mere matters of discipline from arbitrary and capricious disregard of human rights.[15] It is this line for which federal courts must diligently search while treading about in the twilight zone that separates interference with a state's autonomy in policing its own penal system from the enforcement of federally guaranteed rights.

■ In the case presently before this Court the line sought is that which separates matters of internal discipline from the constitutional right of access to the courts. For although prison mail may be censored, regulations or restrictions that effectively preclude an inmate from communicating with courts cannot be tolerated. Spires v. Dowd, 271 F.2d 659 (7th Cir. 1959) and cases cited therein.

■ Perhaps the more difficult problem is determining what is meant by the term "access." Black defines it as "Approach; or the means, power or opportunity of approaching."[16] Webster's explains it as meaning "[T]o take preliminary steps toward, as a task; to make advances to."[17] Thus it can mean either the physical fact of imparting notice or knowledge to another, or it can be understood as including the content of the communication itself. It is the latter meaning that plaintiff would have us adopt. Certainly, "access" includes at least the former, that is, the right to have one's communication physically transferred to the court. (See Corwin, Constitution of the United States, Revised and Annotated, p. 1137 (1952); Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); Spires v. Dowd, 271 F.2d 659 (7th Cir. 1959); Dowd v. United States ex rel. Cook, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215 (1951).) Moreover, it has been declared that under certain circumstances "reasonable

11. See e.g., State of Oregon ex rel. Sherwood v. Gladden, 240 F.2d 910 (9th Cir. 1957); United States ex rel. Atterbury v. Ragen, 237 F.2d 953 (7th Cir. 1956); Pierce v. La Vallee, 293 F.2d 233 (2nd Cir. 1961) and cases cited therein.

12. Ortega v. Ragen, 216 F.2d 561 (7th Cir. 1954), cert. den., 349 U.S. 940, 75 S.Ct. 786, 99 L.Ed. 1268 (1955); United States ex rel. Vraniak v. Randolph, 161 F.Supp. 553 (E.D.Ill.1958), aff'd, 261 F. 2d 234 (7th Cir. 1958), cert. den. 359 U.S. 949, 79 S.Ct. 733, 3 L.Ed.2d 681 (1959).

13. Cf. Sostre v. McGinnes, 334 F.2d 906 (2nd Cir. 1964), cert. den. 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964). Childs v. Pegelow, 321 F.2d 487 (4th Cir. 1963).

14. See Kirby v. Thomas, 336 F.2d 462 (6th Cir. 1964) and cases cited therein.

15. Cf. Pierce v. La Vallee, 293 F.2d 233, 235 (2nd Cir. 1961); "Whatever may be the view with regard to ordinary problems of prison discipline, however, we think that a charge of religious persecution falls in quite a different category." United States ex rel. Hancock v. Pate, 223 F.Supp. 202, 205 (N.D.Ill.1963): " * * * it goes to the more basic question of how long he is to be deprived of his liberty", rather than the freedom of state institutions to maintain discipline. Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

16. Black's Law Dictionary, (4th ed. 1951).

17. Webster's New Collegiate Dictionary, (2nd ed. 1953).

access" may well require that the inmate be permitted to acquire a certain book.[18]

However, no court has gone so far as plaintiff would have us go. In a case closely akin to the case before this Court, the Ninth Circuit denied that reasonable access required that the state furnish library facilities and an opportunity to use them. Hatfield v. Bailleaux, 290 F. 2d 632, 636 (9th Cir. 1961), cert. den. 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961). In that case there was a "law library"[19] for the use of the inmates. However, inmates were forbidden to have any law books of their own, whether purchased or received as gifts. Nor were they permitted to retain possession of any communications from courts, judges or attorneys that contained legal citations. A civil rights complaint was filed, alleging denial of access to the courts. The District Court granted injunctive relief, and the Circuit Court reversed, holding in part: "State authorities have no obligation under federal Constitution to provide library facilities and an opportunity for their use * * *". Certiorari was denied. In Grove v. Smyth, 169 F.Supp. 852 (E.D.Va.1958), petitioner sought to obtain a certain law book. The question was held to be exclusively within the internal jurisdiction and authority of prison officials.[20] Other than United States ex rel. Mayberry v. Prasse, 225 F.Supp. 752 (E.D.Pa.1963), there have been no cases in this Circuit that have presented this issue directly. However, some indication of how this Circuit would rule may be gleaned from its approving citation of Grove v. Smyth, 169 F.Supp. 852 (E.D.Va.1958) in a related matter. Gurczynski v. Yeager, 339 F.2d 884 (3rd Cir. 1964).

Perhaps the entire matter has been properly summed up by Judge Hays of the Second Circuit. In upholding the right of prison authorities to impose reasonable restrictions on the exercise of constitutional rights by prison inmates, Judge Hays said: "In other words the nub of this whole situation is not to be found in the existence of theoretical rights, but in the very practical limitations on those rights which are made necessary by the requirements of prison discipline." (See Sostre v. McGinnes, 334 F.2d 906, 911 (2nd Cir. 1964), cert. den. 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed. 2d 96 (1964).) Whether reasonable access is being provided must in the end depend upon the circumstances of each case. In this case, the plaintiff has been provided with access to at least three sources for his legal materials (see footnote 1). Moreover, he is permitted to retain these materials in his cell while he is preparing his legal actions. His right of physical communication with this Court has not in any way been impaired, nor does he claim that it has. There is no law library at the Graterford Correctional Institution.

Under the facts of this case it is clear that plaintiff has not been denied his constitutional right of access to the courts.

### III. Availability of Injunctive Relief

Finally, to conclude this matter the Court must dispose of yet another question raised in plaintiff's complaint; namely that his efforts to secure legal materials from even the permissible sources have been blocked.

18. See United States ex rel. Mayberry v. Prasse, 225 F.Supp. 752 (E.D.Pa.1963). There the court, per Grim, J., ordered that plaintiff be permitted to acquire the Rules of Procedure governing actions in Pennsylvania courts. The holding in that case, however, cannot be extended beyond its peculiar facts.

19. Although later enlarged, the law library at the time of the suit consisted of "two volumes of Corpus Juris Secundum, portions of the Oregon Revised Statutes, and some advance sheets from the Oregon Supreme Court." Id. 290 F.2d at p. 639.

20. See also Taylor v. United States, 179 F.2d 640 (9th Cir. 1950); Barber v. Page, 239 F.Supp. 265 (D.C.Okl.1965).

14

Notwithstanding our refusal to set forth with particularity plaintiff's rights to acquire and retain legal materials, if he is denied a privilege enjoyed by his fellow inmates he has stated a complaint cognizable under the federal Constitution. For without regard to whether the state must actually afford these privileges, if it does so generally but discriminates against plaintiff he has been denied the equal protection of the law as guaranteed by the Fourteenth Amendment. [Cf. Cochran v. State of Kansas, 316 U.S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453 (1942)]. However, the Court has received assurances from the defendants that prison authorities will in no way prevent plaintiff from acquiring legal materials from the three independent sources described above. Moreover, it was emphasized by the Bureau of Correction that "the institutional authorities will in no way censor or otherwise determine whether the material is in fact necessary." It thus appears that this ground of the complaint has been effectively removed.

An injunction is an extraordinary remedy, and should not be employed lightly. Where the basis for it has been removed, with no reason to anticipate its recurrence, it can have no meaningful effect and should not issue. [Cf. Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945); United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Two Guys from Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961).] So it appears in the case before this Court. Any activity that may have been open to attack has been discontinued, and we have been assured that plaintiff's freedom of communication will not be frustrated in the future. This factual issue, therefore, has become substantially moot. (See Roberts v. Pegelow, 313 F.2d 548 (4th Cir. 1963).

For all of the foregoing reasons, it is the judgment of this Court that the complaint be dismissed and that no injunction shall issue.