**Michael BECKER, Plaintiff,**

**v.**

**John OSWALD, Individually and in his capacity as President of Pennsylvania State University et al., Defendants.**

**Civ. No. 73–279.**

United States District Court, M. D. Pennsylvania.

July 20, 1973.

Robert M. Rosenblum, Goldstein & Rosenblum, Philadelphia, Pa., for plaintiff.

Delbert J. McQuaide, State College, Pa., for defendants.

## OPINION

MUIR, District Judge.

As of February 23, 1973, Plaintiff Michael Becker was a student in good standing at the Pennsylvania State University in State College, Pennsylvania. On that date, the State College police arrested him on charges of unlawful possession of controlled substances. Based on this arrest, the Defendant University commenced disciplinary proceedings against Becker. Following a hearing attended by Becker, the University Hearing Board concluded that he should be dismissed from the University, with leave to apply to the President of the University for readmission after one year. Becker did not avail himself of his right to appeal the Hearing Board's decision to the University Appeals Board.

Plaintiff commenced this suit under the Civil Rights Act, 42 U.S.C. § 1983, on May 29, 1973. He asserts that the procedures employed at the hearing are constitutionally inadequate and that the Board's decision was not based on substantial evidence. He requests immediate reinstatement to the University, with credit for courses successfully completed during the pendency of the disciplinary action and this suit.

In my view, Plaintiff's failure to appeal administratively the Hearing Board's decision precludes him from obtaining reinstatement under the Civil Rights Act. Consequently, the merits of his attack on the disciplinary hearing, and the merits of Defendant Pennsylvania State University's position that it may not be sued under 42 U.S.C. § 1983,[1] will not be discussed in this Opinion. However, since Plaintiff may appeal from this Court's decision and the Court of Appeals might not agree that the doctrine of exhaustion of state administrative remedies controls this case, a full set of supplementary findings of fact relating to the procedures and evidence at the disciplinary hearing will be appended.

[1] In several civil rights suits for injunctive relief, the Supreme Court has stated that exhaustion of state administrative remedies was not a prerequisite to the suit.[2] Despite the broad language in those cases, and even though the Supreme Court has not required such exhaustion in any case yet decided, the majority of the Courts of Appeals which have interpreted these cases has held that failure to exhaust is excused if the administrative remedy is inadequate or futile.[3] The Court of Appeals for this

---

1. See Braden v. University of Pittsburgh, 477 F.2d 1 (3d Cir. 1973).

2. Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct.

1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

3. Toney v. Reagan, 467 F.2d 953 (9th Cir. 1972); Whitner v. Davis, 410 F.2d 24 (9th Cir. 1969) (also holds that an aggrieved person is not required to exhaust an administrative remedy which would not provide "prospective" relief, i. e. relief

circuit has not set forth such a rule of general application, but has held that a state prisoner must exhaust his administrative remedies before he will be heard to contest in a civil rights suit his prison classification which resulted in his inability to earn remission time.[4] In its Opinion, the Court noted the desirability of avoiding potentially voluminous and frequently unnecessary litigation.[5] As other courts have noted, the exhaustion requirement also flushes out unconstitutional reasons for the state's action and gives state bodies the opportunity to review their own decisions.[6] These salutary effects counsel adoption by this court of the majority rule: failure to exhaust state administrative remedies bars a civil rights suit for injunctive relief unless the remedies are inadequate or resort to them would be futile.

Given this rule, Plaintiff's case turns on whether the administrative remedies open to him were adequate and if so, whether he exhausted them.

Defendants proved at trial that, on its face, an appeal was a fair remedy which could have provided Plaintiff the relief he now requests. The details of the standard appellate procedure are set out in the accompanying footnote.[7]

Because, as will be discussed below, Becker maintained at trial that he had unsuccessfully attempted to appeal the Board's decision, he did not offer any evidence that taking an appeal would have been futile. For example, there was no evidence that the Defendant President of the University, who has ultimate authority to decide appeals, would have approved his dismissal regardless of the recommendation of the Appeals Board.[8]

The University's Handbook of Policies and Rules for Students, a copy of which

averting a threatened deprivation) ; Metcalf v. Swank, 444 F.2d 1353 (7th Cir. 1971) ; Beattie v. Roberts, 436 F.2d 747 (1st Cir. 1971) ; Drown v. Portsmouth School District, 435 F.2d 1182 (1st Cir. 1970) ; Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969). See also United States ex rel. Wakeley v. Pennsylvania, 247 F. Supp. 7, n. 9 at 9 (E.D.Pa.1965). Cf. Armsden v. Cataldo, 315 F.Supp. 129 (D. Mass.1970) (addition of state's interest as an element of the test). Contra, Rainey v. Jackson St. College, 435 F.2d 1031 (5th Cir. 1970) ; Moreno v. Henckel, 431 F.2d 1299 (5th Cir. 1970) ; Stevenson v. Board of Education of Wheeler County, Ga., 426 F.2d 1154 (5th Cir. 1970).

4. Marnin v. Pinto, 463 F.2d 583 (3d Cir. 1972).

5. Id. at 586.

6. See, e. g., Beattie v. Roberts, 436 F.2d 747, 748–749 (1st Cir. 1971) ; Drown v. Portsmouth School District, 435 F.2d 1182, n. 2 at 1186 (1st Cir. 1970).

7. According to the Handbook of Policies and Rules for Students, the University Appeals Board is appointed by the President of the University and is composed of two faculty members, 1 undergraduate, 1 graduate and 1 administrator, none of whom are members of the Hearing Board. The President chooses the faculty members from the four persons nominated by

the Faculty Senate Council, and the student members from nominees selected by several student groups. The members serve for one year.

If the Hearing Board recommends dismissal of the student, the Appeals Board is required to hear an appeal if timely filed. Such an appeal stays the imposition of the sanction recommended by the Hearing Board unless the President in writing and for good cause directs otherwise.

Hearings before the Appeals Board are *de novo*, with the same procedure as at the Hearing Board hearings. See Supplementary Findings of Fact 13, 15 and 16, appended to this Opinion.

After the hearing, the Appeals Board files a recommendation for disposition with the Director of the Office of Conduct Standards. The Director may implement the recommendation or may transmit the case to the President of the University, as he sees fit. The President may follow or disregard the recommendation without further proceedings.

8. See Supplemental Finding of Fact 32, appended to this Opinion. Cf. Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968) (appeal to the ultimate appellate authority not required since it was virtually certain that he would approve the decision being attacked).

was given to Plaintiff prior to his April 12, 1973 hearing before the University Hearing Board, provides that a student who wishes to appeal from the findings or recommendation of the Board must submit a written request for an appeal within five days of the date of the original hearing. Plaintiff clearly did not comply with this requirement. However, he was not notified of the Board's decision until four days after the hearing. Presumably because of this time lapse, the University did not require strict compliance by Plaintiff.

On April 16, 1973, Becker was orally notified of the Board's decision, and was advised that he had five days within which to file an appeal therefrom. He did not do so. On April 23, 1973, Dr. Suit, Director of the Office of Conduct Standards at the University, sent Becker a letter advising him that a written request for an appeal would have to be submitted within five days of receipt of the letter.

Becker testified at trial that on April 25, 1973, he sent to Dr. Suit a letter requesting an appeal, a copy of which was introduced in evidence. The court does not believe this testimony. Dr. Suit's testimony that no appeal letter from Becker was *ever* received by him is believed by the court not just because Dr. Suit was a more credible witness than Plaintiff, but also because much of Plaintiff's testimony on this particular point casts doubt on his veracity. His testimony and the lapses in it are set out in a footnote.[9]

The court concludes that Plaintiff deliberately and knowingly failed to take advantage of a reasonable opportunity to appeal administratively from the Hearing Board's findings of guilt and recommendation of dismissal. Plaintiff has not proved that the appeal procedure was inadequate or that an appeal would have been futile. His right to appeal may no longer be available to him, since the President of the University has approved the dismissal; nevertheless, his knowing failure to appeal precludes him from obtaining from this court the relief which might have been afforded him by the University.[10] To hold that he is not barred because his administrative remedies are no longer available to him would contravene the policies in favor of exhaustion, such as averting unnecessary litigation and providing state bodies an opportunity to review their own decisions. No justification for such a result appears in the record of this case.

This Opinion constitutes the findings of fact and conclusions of law necessary for the court's adjudication.

Judgment in favor of Defendants will be entered.

## APPENDIX—SUPPLEMENTAL FINDINGS OF FACT

1. In his capacity as Director of the Office of Conduct Standards, Dr. Donald T. Suit receives complaints against students, decides whether to prefer charges, informs students of their rights, procedures at hearings, possible sanctions, and appeal procedures, gathers information relevant to the charges via tele-

---

9. Becker's letter dated April 25, 1973 states that he had received Suit's letter of April 23, 1973 notifying him of the necessity of appealing within five days. Dr. Suit's letter was addressed to Becker's permanent residence in Philadelphia. Becker testified that it was forwarded to him in State College. In my opinion, such speedy mail delivery is highly improbable. Furthermore, at the trial, which took place only one and one half months after the extremely important letter of appeal was allegedly written, Becker could not remember where he wrote it, on whose typewriter he typed it, or where he mailed it. He did not send it by registered or certified mail. He sent a copy to his attorney, but the attorney's office does not use a receiving stamp and the attorney was not asked to testify at the trial.

10. Whitner v. Davis, 410 F.2d 24, 29 (9th Cir. 1969); Toney v. Reagan, 467 F.2d 953, 957 (9th Cir. 1972). Cf. Marnin v. Pinto, 463 F.2d 583, 586 (3d Cir. 1972) (state prisoner's suit barred by failure to exhaust his administrative remedies; whether his right to appeal administratively was still available to him is not discussed).

phone, presents evidence and testimony at hearings, informs the board of an accused student's prior record, and advises the board of precedents in cases of similar infractions.

2. On February 23, 1973, Michael Becker was arrested at State College, Pennsylvania and charged with the following violations of Pennsylvania law:

(a) Possession of marihuana and hashish

(b) Possession of amphetamines

(c) Possession of barbiturates

(d) Possession with intent to deliver amphetamines

(e) Possession with intent to deliver marihuana

3. On February 26, 1973, Dr. Suit read in a local newspaper that Becker had been arrested.

4. Dr. Suit began a disciplinary folder on Plaintiff and unsuccessfully attempted to telephone Plaintiff.

5. On March 15, 1973, Dr. Suit effected a "registration hold" as a means of compelling Plaintiff to get in touch with him.

6. When he attempted to register on March 27, 1973, Becker learned of the "registration hold."

7. Although Plaintiff was not permitted to register, he was allowed to and did attend classes and take examinations during the entire spring term.

8. On April 5 and 9, 1973, Dr. Suit met with Plaintiff. Suit gave Becker a copy of the charge against him and a copy of excerpts from the handbook of policies and rules relating to procedures at hearings, sanctions and appeal procedures.

9. The University charge against Plaintiff was as follows:

Use, possession, distribution or being under the influence of narcotics or dangerous drugs, i. e., the accused did engage in or had intent to engage in possession and/or manufacture of drugs in the State College, Pa. area, for a period of time up to the time of his arrest on February 23, 1973.

10. In April, 1973, and in fact at least until June 8, 1973, Plaintiff had not been indicted for the alleged crimes for which he had been arrested on February 23, 1973.

11. Becker was advised orally on April 5 and 9, 1973, that the University disciplinary hearing would begin at 1:30 P.M. on April 12, 1973, which it did.

12. Becker did not appear at the hearing until 2:30 P.M. on April 12, 1973, by which time Dr. Suit had presented the evidence against him. Becker admitted that his lateness was his error. He reviewed the documents which had been presented to the board, made an opening statement denying his guilt, and was questioned by the board.

13. The standard procedures for student disciplinary hearings at Pennsylvania State University were followed at the hearing on the charge against Plaintiff. These procedures are:

(a) The University Hearing Board consists of two students, a faculty member, an administrator and a senior faculty member, as chairman. The chairman, chosen by President Oswald, selects the other four members from several pools. Some of the persons in the pools are selected by the President and the remainder by student and faculty bodies.

(b) The accused student has the right to challenge the impartiality of any or all members of the Board. Although he is not notified in advance who will be on the Board and so does not have an opportunity to investigate their backgrounds, he is permitted to ask them any questions he desires. In the event he challenges a member, the remaining members rule by a majority vote on the challenge.

(c) The student is not allowed to be represented by a lawyer, but may use any member of the University community as an "advisor." The University may not be represented by an attorney.

(d) Witnesses are permitted, but the Board has no power to subpoena any person other than members of the University community.

(e) The Student has the right to cross-examine the University's witnesses.

(f) No stenographic record is made and generally only the Chairman keeps notes.

14. At his hearing, Plaintiff Becker did not request an attorney or a stenographic record, and did not challenge the impartiality of any member of the Board.

15. The University's Policies and Rules for Students, 1972–1973, provides that hearsay evidence is not admissible. (Plaintiff's exhibit, P–3, p. 38, C2a)

16. The University's Disciplinary System Manual provides, *inter alia*, the following guideline for the Disciplinary Board Chairman, who is required to rule on the admissibility of evidence:

"Hearsay is not what a witness knows personally but what he is told by others. This is not intended to eliminate facts that are generally known to be correct, but is more a limitation on the admissibility of evidence that has no traceable origin or is not general knowledge of the public. Opinions, unless inferred from fact or unless they come from an expert, are hearsay evidence." (Defendant's Exhibit #4, p. 22)

17. The Disciplinary System Manual also provides that regardless of such guidelines, "the hearing should be conducted in such a manner as to do substantial justice and '. . . shall not be restricted unduly by rules of procedure or evidence.'" (Defendant's Exhibit #4 at 20)

18. The only evidence against Plaintiff was his own testimony and hearsay.

19. The hearsay evidence consisted of: two newspaper articles (Plaintiff's Exhibit #2), a press release from the State College Department of Police (Defendant's Exhibit #8), Dr. Suit's notes of his conversations with Chief Straley of the State College Police and with the local Magistrate's Office (Defendant's Exhibit #9), Dr. Suit's notes of his conversation with Charles Haddad, Chief Special Prosecutor of the Philadelphia D.A.'s office, a newspaper article describing Plaintiff's involvement in a 1971 drug-related matter in Philadelphia, and Dr. Suit's testimony.

20. Chief Straley had previously refused to appear or allow his men to appear at University disciplinary hearings, or to give signed statements, but had agreed to give information via telephone and to permit his name to be used as the source thereof.

21. The Board did not request the authors of the newspaper articles considered by the Board to attend the hearing.

22. Becker moved to strike the hearsay evidence. The Board Chairman, Dr. Tammen, denied the motion because he found that the hearsay emanated from public officials and was therefore admissible as an exception to the normal rule of the University. See Supplemental Findings of Fact 15–16.

23. The primary evidence against Plaintiff was that illegal drugs of substantial value were found in the apartment where he was sleeping, for which he had signed the lease, and for which he shared the rent with one other person. That other person was also sleeping there when the drugs were seized by the police.

24. There was no direct evidence presented to the Board that Becker himself possessed the drugs found in his apartment.

25. Secondary evidence taken into consideration by the Board in reaching their determination of guilt included:

(a) Becker's statement that he "no longer" used illegal drugs; the Board felt this was a tacit admission of prior use.

(b) Becker's knowledge of drugs and drug prices. That knowledge came to their attention when Becker explained that the drugs seized could

not possibly have been worth $23,000.-00 as had been stated in the newspaper articles introduced against him.

(c) Becker's payment by check of one month's rent on an apartment, rented to a third party, where an illicit drug laboratory had allegedly been uncovered by the police. At the time of the hearing, no arrests had resulted from the police raid. Becker testified that the payment was a loan.

(d) Becker's legal possession of guns.

(e) The discovery by the police of illegal drugs in a car owned by Becker.

(f) Becker's involvement in the 1971 Philadelphia drug incident, which had taken place while Becker was not registered at the University. (See Defendant's Exhibit #10)

26. The University's Disciplinary System Manual suggests that the hearing board chairman state at the hearing "that a decision must be made on the guilt or innocence of the accused before board consideration of the accused's previous record and before the imposition of sanction." (Defendant's Exhibit #4 at p. 19)

27. The Board considered it important that, in their opinion, Becker was not simply a user of illegal drugs, but was also involved in their distribution.

28. The Board's conclusion that Plaintiff was not just a user was based primarily on the value of the drugs found when he was arrested. The only evidence of that value was the figure of $23,000 appearing in a newspaper article. The article attributed the figure to Chief of Police Straley, but Straley in a conversation with Dr. Suit stated that he saw the figure in the newspaper. According to Dr. Suit, Chief Straley did state that Becker was involved with a "large quantity of drugs."

29. The Board unanimously concluded that Becker posed "a genuine and serious threat to the University Community." (Defendant's Exhibit 11). Much of the evidence considered by it was relevant to this issue, not to the charge against Becker, and the Board failed adequately to separate its consideration of the two issues.

30. Becker was found guilty of the charge against him by a unanimous Board and a sanction of disciplinary dismissal imposed. Unlike disciplinary expulsion which is permanent and which could have been imposed, dismissal permits the student to apply to the University President for re-admission after one year. Re-admission is completely within the discretion of the President.

31. According to the University's Policies and Rules for Students, 1972–1973, the University has the burden of proving guilt by "clear and convincing evidence." (Plaintiff's Exhibit #3, p. 39, C2j)

32. The Board recommended to President Oswald that Becker's re-admission be contingent on a verdict of not guilty in the criminal case pending against him in State College.

33. Not having received an appeal notice from Plaintiff, Defendant Oswald approved his dismissal on May 7, 1973, and sent a final notice thereof to Plaintiff on May 29, 1973. There is no evidence whether, in approving the dismissal, Oswald considered all or any of the evidence presented at the hearing or whether he simply approved the recommendation of dismissal because Plaintiff had not appealed.