Robert **ROBERTS**

v.

**Vernon L. PEPERSACK**, State Commissioner of Correction, **Franklin K. Brough**, Warden, Maryland Penitentiary and **John P. Garrity**, Warden, Maryland House of Correction.

**Civ. A. No. 17031.**

United States District Court
D. Maryland.
June 29, 1966.

---

⚷680

Robert Roberts, pro se.

Thomas B. Finan, Atty. Gen. of Maryland, and Morton A. Sacks, Asst. Atty. Gen., for respondents.

NORTHROP, District Judge.

■ Robert Roberts, an inmate at the Maryland House of Correction, has filed a complaint in this court seeking redress against prison authorities for the alleged denial of his civil rights while incarcerated.[1] He has titled his complaint "Petition for a Declaratory Judgment & General Relief." The State, acting through the Attorney General, has moved to dismiss the complaint for failure to state a claim upon which relief can be granted, and has filed with the court a memorandum in support of its position. Roberts responded with what he styles a "Cross Motion to Dissmiss [sic] Defendants' Motion," but which the court accepts as his answer to the Motion. Plaintiff is not represented by counsel and has paid the $15.00 filing fee.

The allegations of the complaint are based on action taken by prison authorities on October 15, 1965, when Roberts, then imprisoned at the Maryland Penitentiary, circulated material among the inmates informing them that on October 18 there would be a "collective protest against prisoners [sic] mistreatment, inequities, and criminal neglect by State correctional officials and civil personnel."[2] (Quoting from the complaint.) This protest was to take the form of a sit-down demonstration. Allegedly, notification was sent to Governor J. Millard Tawes, to prison officials, through the use of two inmate "informers," and to the local newspapers in the form of an "Open Letter to the General Public."

Roberts claims that in the afternoon of October 15, 1965, acting upon the orders of the supervising officers, he reported to the prison hospital. There he was seized by several officers and placed in a station wagon for transfer to the Maryland House of Correction. Upon arrival, he was placed in solitary confinement.

It is not clear from the complaint how much time was actually spent in isolation, but his "Motion" states that for twenty-seven hours, "he was forced to go naked[3] and lie on a cold concrete floor without mattress or blankets * * * in a temperature of about 40°, and that he was held incommunicado from the assistence [sic] of his family among other things." In the complaint, Roberts states that these conditions existed for the "first Twenty-six hours, out of a total of seven days." Thus, although it is unclear to what extent Roberts' stay in isolation exceeded twenty-six or twenty-seven hours, the court assumes that solitary confinement lasted a week, but its harsher aspects only slightly more than a full day.

After his stay in solitary confinement, Roberts was removed to a "semi-segregation section," where he was denied "bathes [sic] and other toiletry for Sixteen days; denied correspondence with his family, friends, as well as visits, for Fourteen days after leaving the hole [prison term for solitary-confinement cell]." It is assumed that Roberts is no longer in semi-segregation, although, if he is, the severity of the restraint has been allayed. I find evidence of this relaxation in the numerous communications received by the court from Roberts and from the fact that the court has been contacted by his family with regard

1. Roberts stands convicted of two counts of simple assault for which he received consecutive twenty-year sentences. The first of these sentences began after Roberts had completed a fourteen-year sentence for being a rogue and vagabond, possession of a deadly weapon, and theft of an automobile.

2. Roberts sets forth six bases for the discontent. They are not the subject of this complaint but are offered only as justfication for his actions.

3. It is interesting to note that Roberts' statement in his "Motion" that he was without clothing while in isolation contradicts the earlier assertion in his complaint that he was issued coveralls to wear during this period.

to this action—all of which indicates that plaintiff has access to the mail and to the court, and has communicated with and/or seen members of his family.

In that part of the complaint which Roberts' terms "Questions Presented," he enumerates four bases for relief. The court paraphrases them in the form of contentions:

1. Custody in the Maryland House of Correction is in violation of the Fourteenth Amendment, because he was originally sentenced to the Maryland Penitentiary.

2. The First Amendment of the Constitution protects the right to demonstrate or protest in the manner involved here.

3. The transfer to the Maryland House of Correction constituted both a denial of due process, because executed without a formal hearing, and denial of equal protection of the laws, since other prisoners are granted hearings prior to transfer.

4. Plaintiff was deprived of the rights, privileges, and immunities to which he is entitled under the Constitution.

On the basis of these contentions, plaintiff believes that the defendants have violated Title 18, United States Code, § 241, and prays that his rights be declared. These rights, according to the complaint, include the right to appointed counsel, the issuance of a writ of habeas corpus, and a declaration that the transfer was unconstitutional.

■■ Roberts' choice of actions is incorrect. Title 18 is concerned with crimes and criminal procedures, and Section 241 imposes criminal penalties for the violation of an individual's civil rights. Suit must therefore be brought by the United States. Actions of a civil nature cannot be brought under these provisions. E. g. Mattheis v. Hoyt, 136 F.Supp. 119 (W.D.Mich.1955). On the other hand, were the court to treat the complaint as a habeas corpus petition, it still would be forced to deny relief because Roberts has failed to meet the federal requirement that he exhaust his state remedies. 28 U.S.C. § 2254.

■■ However, even though Roberts has not selected a statute under which relief could be granted, I feel that it is the court's duty, under these circumstances, to frame his allegations in terms of an appropriate statute. Ample authority exists for the position that the mere fact that one seeks the wrong form of relief should not necessarily preclude the court from considering his claims. In the case of Roberts v. Pegelow, 313 F.2d 548 (4th Cir. 1963), the Fourth Circuit dismissed the appeal because the issues became moot, but, nevertheless, held:

"Unlearned inmates of penal institutions, however, are usually ignorant of the legal niceties of the procedural rules in the courts. If one presents in his own behalf a petition which clearly merits some relief, he ought not to fail entirely because he misconceives the nature of the proceeding or mislabels his petition. If the petition substantively is one for injunctive relief, the court most certainly has a discretionary right to treat it as such, despite the fact that the untutored petitioner has mistakenly designated it as a petition for a writ of habeas corpus." Id. at 550.

Courts have acted similarly in Richey v. Wilkins, 335 F.2d 1 (2d Cir. 1964) (the court treated the complaint as one for damages even though plaintiff requested general relief); Kregger v. Posner, 248 F.Supp. 804, 806 (E.D.Mich.1966) ("the court should view the allegations in a complaint for damages under this section [42 U.S.C. § 1983] prepared by a prison inmate, without benefit of counsel, as liberally as possible"); Beckett v. Kearney, 247 F.Supp. 219 (N.D.Ga. 1965) ("[h]is petition does not bear a label, but it is the duty of this Court to give relief if demanded by the facts regardless of the form of action"); United States ex rel. Henson v. Myers, 244 F.Supp. 826 (E.D.Pa.1965) (action under 18 U.S.C. § 241 treated as a request

for a preliminary injunction under 42 U.S.C. § 1983).

Most cases containing allegations that relate to prison conditions have been brought under Title 42, U.S.C. § 1983, which provides that

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * * subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Title 28, U.S.C. § 1343, bestows on the federal courts jurisdiction to enforce such claims. The case of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed. 2d 492 (1961) brings section 1983 into the field of tort litigation. In so doing, *Monroe* affords recovery to citizens injured by the negligent and irresponsible conduct, as well as the willful actions, of state officers. Because liability may exist under section 1983 where a defendant has acted in a nonwillful manner, that section is the one best suited to compensate private citizens for damages arising from unconstitutional actions on the part of state authorities.[4] Its main purpose is to create a federal right of action where a state official has deprived a citizen of a right secured under the Fourteenth Amendment. Monroe v. Pape, supra.

Numerous cases have incorrectly limited section 1983 to instances where denial of due process is alleged. E. g., Joyce v. Ferrazzi, 323 F.2d 931 (1st Cir.

1963); Hardy v. Kirchner, 232 F.Supp. 751 (E.D.Pa.1964); Bryant v. Harrelson, 187 F.Supp. 738 (S.D.Tex.1960). At the same time, these cases have limited section 1985(3), a conspiracy section requiring that violations thereunder be perpetrated by two or more persons, to claims of denial of equal protection of the laws. Were these cases correct interpretations of section 1983, there would exist a hiatus in the law whereby a citizen would have no recourse under the Civil Rights Act (42 U.S.C. §§ 1981–1995) against a state official acting alone and not in concert with another in depriving the citizen of equal protection of the laws. This loophole, favoring the illegal activity of a state official, has been removed by cases holding that section 1983 covers *all* rights protected by the Fourteenth Amendment, e. g., Powell v. Workmen's Compensation Board of the State of New York, 327 F.2d 131 (2d Cir. 1964), and that it may be employed to encompass conspiracies. E. g., Cohen v. Norris, 300 F.2d 24 (9th Cir. 1962).

Since the instant case is being decided on defendant's motion to dismiss, it is necessary that the court focus on the facts that must be alleged in order for plaintiff to state a claim under section 1983. Speaking generally of this type of motion, Professor Moore says that

"a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." 2 Moore, Federal Practice ¶ 8.13, at 1706 (2d ed. 1962).

---

4. Additional reasons are given in the next paragraph.
In the case of Negrich v. Hohn, 246 F. Supp. 173 (W.D.Pa.1965), the court stated that section 1983 is ill-suited to compensate citizens injured by state law-enforcement officers, although the court does seem to suggest that no more suitable statute is available. "The defects of the existing situation are obvious. 42 U.S.C. § 1983 does not furnish an adequate remedy in meritorious cases. The right to bring a lawsuit against an impecunious policeman can scarcely be considered an effective and complete remedy. Well-designed means of protection, with precise and specific provisions, should be made available. Relief akin to that provided in another field of personal injuries by legislation such as the Federal Tort Claims Act of August 2, 1946, 60 Stat. 842, 28 U.S.C. § 1346, might be appropriate." Id. at 182.

With specific reference to section 1983, it has been held:

"All that is necessary to prevent the dismissal of a complaint brought under 42 U.S.C.A. § 1983 is that it allege facts constituting a deprivation under color of state authority of a right guaranteed by the Fourteenth Amendment." Roberts v. Trapnell, 213 F.Supp. 49, 50–51 (E.D.Pa.1962).[5]

 In determining the merits of defendant's motion, the court's attention is first directed to the meaning of the phrase, "under color of any statute [etc.] * * * of any State," which was first defined in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) as

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law * * *." Id. 313 U.S. at 326, 61 S.Ct. at 1043.

This definition has since been reaffirmed as correctly defining the phrase. E. g., Screws v. United States, 325 U.S. 91, 112–113, 65 S.Ct. 1031, 1040–1041, 89 L.Ed. 1495 (1945), defining it under 18 U.S.C. § 242; Monroe v. Pape, supra, 365 U.S. at 184–187, 81 S.Ct. 482–484, defining it under 42 U.S.C. § 1983. That the State Commissioner of Correction and the wardens, defendants in the present case, were acting under color of state law is not disputed.

The second element of section 1983, a denial of the "rights, privileges, or immunities secured by the Constitution and laws" poses more difficult problems. These include not only the question of what rights exist, but also, assuming that the rights are defined, who then may be liable, and on what basis liability is determined. *Monroe* and later cases are directed to the solution of these problems.

*Monroe* indicates that section 1983, as a basis for civil suits, is to be "read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Id. 365 U.S. at 187, 81 S.Ct. at 484. In that case, the deprivations alleged by the plaintiffs were illegal arrest, illegal search and seizure,, and severe mistreatment—all inflicted by Chicago police officers, who, in the middle of the night, ransacked plaintiffs' house, supposedly in search of evidence relating to a two-day-old murder. The District Court for the Northern District of Illinois dismissed the complaint and was affirmed by the Seventh Circuit. Monroe v. Pape, 272 F.2d 365 (7th Cir. 1959). The Supreme Court reversed. Upon remand, plaintiffs were awarded $13,000. Monroe v. Pape, 221 F.Supp. 635 (N.D.Ill. 1963).

Much confusion has stemmed from the Court's broad language (quoted above) regarding the relation between tort liability and section 1983. Compare Hardwick v. Hurley, 289 F.2d 529 (7th Cir. 1961) with Cohen v. Norris, supra. Undisputed, however, has been the interpretation given to section 1983 that in order to state a claim under the section, one must allege a Fourteenth Amendment violation. (The section, when enacted, was entitled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes." Act of April 20, 1871, ch. 22 § 1, 17 Stat. 13.) Plaintiffs have been held to have asserted claims under the Fourteenth Amendment when they have alleged illegal search and seizure and physical mistreatment incident thereto (Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473 (1961), 221 F.Supp. 635 (N.D.Ill.1963), Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965), Cohen v. Norris, supra, Hughes

---

5. For an analysis of the elements of section 1983, the case of Cohen v. Norris, supra, is most often cited. "In order to state a claim under 42 U.S.C.A. § 1983, facts must be alleged which show that the defendant: (1) while acting under color of any statute, ordinance, regulation, custom or usage of any State or Territory; (2) subjects, or causes to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." Id., 300 F.2d at 30.

v. Noble, 295 F.2d 495 (5th Cir. 1961), Cohen v. Cahill, 281 F.2d 879 (9th Cir. 1960), Selico v. Jackson, 201 F.Supp. 475 (S.D.Cal.1962)); imprisonment without a hearing (Johnson v. Crumlish, 224 F. Supp. 22 (E.D.Pa.1963)); illegal arrest and physical abuse (Bargainer v. Michal, 233 F.Supp. 270 (N.D.Ohio 1964)); cruel and unusual punishment while in prison (Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966), Talley v. Stephens, 247 F. Supp. 683 (E.D.Ark.1965), United States ex rel. Hancock v. Pate, 223 F.Supp. 202 (N.D.Ill.1963), Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962)); series of vexatious arrests without warrants issued and without charges being placed (Marland v. Heyse, 315 F.2d 312 (10th Cir. 1963)); denial of equal protection of the laws (Rivers v. Royster, 360 F.2d 592 (4th Cir. 1966), Bolden v. Pegelow, 329 F.2d 95 (4th Cir. 1964)); invasion of privacy (York v. Story, 324 F.2d 450 (9th Cir. 1963)); failure to provide a trial transcript after court order so directing (Washington v. Official Court Stenographer, 251 F.Supp. 945 (E.D.Pa. 1966)).

The importance of vindicating these violations, however, must be tempered by a reluctance to subject police officers and other officials to fear of reprisal for their activities. In order for law-enforcement officers to carry out their functions with the efficiency and thoroughness required, they must be protected from "tort actions based upon honest misunderstandings of statutory authority and mere errors of judgment." Selico v. Jackson, supra, 201 F.Supp. at 478. "No one has a constitutional right to be free from a law officer's honest misunderstanding of the law or facts in making an arrest." Agnew v. City of Compton, 239 F.2d 226, 231 (9th Cir. 1956).[6] As a corollary to these two

principles, it is stated that while section 1983 was enacted to "protect the civil rights of individuals, it was not enacted to discipline local law enforcement officers." Basista v. Weir, 225 F.Supp. 619, 625 (W.D.Pa.1964), affirmed in part, reversed in part on other grounds, Basista v. Weir, 340 F.2d 74 (3rd Cir. 1965).

With this reluctance in mind and with the Supreme Court directive in *Monroe* that section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions," the court turns to examine the nature of tort liability that arises under the Act. In the case of Bowens v. Knazze, 237 F. Supp. 826 (N.D.Ill.1965), the Northern District of Illinois, which has the somewhat dubious distinction of being quite familiar with this type of civil rights suit,[7] expresses its insight into tort liability under this section:

"In order for the Civil Rights Act to apply, the acts complained of must result in a deprivation of rights secured by the Constitution. Under the general principles of tort liability, it is sufficient that a reasonable man would have foreseen this result. However, a subsequent determination that the officer's conduct resulted in a deprivation of constitutional rights does not mean that the result was foreseeable and that the officer's conduct was therefore tortious.

"The Civil Rights Act created a new type of tort: the invasion, under color of law, of a citizen's constitutional rights. The test of tortious conduct in an ordinary tort case is, as a general rule, whether at the time of the incident the defendant was negligent, whether he failed to act as a reasonably prudent man. In such cases the

---

6. This principle still has vitality even though much of Agnew was overruled by Monroe v. Pape. See Bowens v. Knazze, 237 F.Supp. 826, 829 (N.D.Ill.1965).

7. Monroe v. Pape (two cases), supra; Walker v. Pate (not published but referred to on appeal, 356 F.2d 502 (7th Cir.

1966)); Cooper v. Pate (not published but referred to on appeal, 324 F.2d 165 (7th Cir. 1963), rev'd per curiam 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964)); United States ex rel. Cleggett v. Pate, 229 F.Supp. 818 (N.D.Ill.1964); United States ex rel. Hancock v. Pate, supra; and now Bowens v. Knazze, supra.

judgment of negligence is based on a standard of behavior left to the determination of the community. The reasonable man is 'a personification of a community ideal of reasonable behavior, determined by the jury's social judgment'. * * *

"In ordinary tort litigation, we allow a jury to find that a defendant committed a tort when, looking back to the event, it finds that the defendant acted unreasonably. A defendant may be found negligent on the basis of a determination that the conduct questioned in the civil suit violated a statute or ordinance (e. g., that the defendant was exceeding the speed limit). These judgments pose no problem because they are merely the application of general standards which, by definition, the defendant should have been able to apply at the time the acts complained of occurred.

"The tort created by the Civil Rights Act, however, is not amenable to such treatment in at least one respect. The measure of a citizen's constitutional rights is not left to the determination of the community-at-large. It is determined by the courts. If that standard has not yet been enunciated by a court in a manner which makes its applicability to the incident at hand clear, the potential defendant cannot be expected to conform his conduct to it. Unlike the requirements of a statute or the judgment of the community which can be applied retroactively, the retroactive application of the judgment of a court as to the requirements of the Constitution—based not on community standards but on legal reasoning—would place a defendant in an impossible position.

"It would require law enforcement officers to respond in damages every time they miscalculated in regard to what a court of last resort would determine constituted an invasion of constitutional rights, even where, as here, a trial judge—more learned in the law than a police officer—held that no such violation occurred." Id. 237 F.Supp. at 828–829. (See also Selico v. Jackson, supra, 300 F.2d at 478.)

■ There has been some disagreement with the ruling that a police officer is immunized from liability when he is acting reasonably in enforcing a statute which later is held unconstitutional or otherwise invalid. Of course, unreasonable and reckless action "under color of any statute" subjects the official to liability under section 1983 regardless of the validity of the state statute.

In Pierson v. Ray, 352 F.2d 213 (5th Cir. 1965), the court remarked that, "[i]nherent in the Monroe holding is the principle that good faith and reliance upon a state statute subsequently declared invalid are not available as defenses" to a suit brought under section 1983. Id. at 218. I find no such inference in *Monroe*. I assume that the Fifth Circuit is basing this statement on the holding in *Monroe* that an individual is "responsible for the natural consequences of his actions." The context in which the Court arrived at this conclusion, however, was a discussion of scienter as a possible requirement of tort liability. It concluded that the liability may be present without "willfulness." The Court did not go so far as to imply that among the "natural consequences" may be a future court decision invalidating a statute, which was believed to be valid when the officer acted. Again, to so hold would seriously impair the activities of of law-enforcement officials.

Also, the facts of the *Monroe* case do not support the conclusion in *Pierson*. In *Pierson*, the defendants acted in good faith reliance upon a disorderly conduct statute which they believed to be valid. In *Monroe*, the conduct of police officers was in flagrant [8] violation both of the Illinois constitution (Art. II, § 6, S.H.

---

8. Their actions may not have been in willful violation of the statute. The Court did not reach this question, having found willfulness not to be a requirement of liability under section 1983.

A.) (set forth in Monroe v. Pape, 365 U.S. at 172, 81 S.Ct. at 476 (n. 6)), and of the Supreme Court decisions applying the Fourth Amendment to the states through the Fourteenth Amendment. Elkins v. United States, 364 U.S. 206, 213, 80 S.Ct. 1431, 1442, 4 L.Ed.2d 1669 (1960); Wolf v. People of State of Colorado, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). (It is to be noted that Monroe v. Pape preceded Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).)

The solution to this problem will be forthcoming from the Supreme Court, which has recently granted certiorari in the *Pierson* case. Petition for cert. filed, 86 S.Ct. 1457 (U.S. May 17, 1966) (No. 1155). The issue confronting the Court in that petition will be whether "state police officers who make allegedly unlawful arrests in good faith attempt to enforce state statute [are] immune from liability for damages under Civil Rights Act." Ibid. For reasons already stated by the court and by the *Bowens* case, supra, I think it would be highly inequitable, as well as immeasurably harmful to the public, to subject state officials to liability for "honest misunderstandings." Selico v. Jackson, supra, 300 F.2d at 478.

In any event, the problem in *Pierson* does not exist in the instant case, since the enabling statutes under which the commissioner (Md.Code Ann. art. 27, §§ 673–678 (Supp.1965)) and wardens (Md.Code Ann. art. 27, §§ 682–683 (Supp.1965)) operate, setting out broad powers and duties, have not been questioned on constitutional grounds. They are unlike statutes such as the Mississippi statute in *Pierson* which limit the activities of members of the public and may or may not have built-in provisions relating to enforcement.

The issue of immunity, when enabling-type legislation is involved, is relevant to the instant case. Whereas it has been stated as an "unvarying rule" that "jailers, institutional superintendents and keepers of almost all varieties enjoy a sweeping immunity under the Civil Rights Act," Delaney v. Shobe, 235 F.Supp. 662, 666 (D.Or.1964),[9] the better view, I believe, is that immunity exists when the plaintiff fails to set forth a denial of rights cognizable under the Constitution and section 1983. In other words, the principal question is whether defendant's acts were of such magnitude that plaintiff was deprived of a constitutional right. If so, defendant may be sued.

The recent case of Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966), best expresses the reason for deciding against a sweeping immunity. There, a mental institution inmate sought damages against the director of the institution, two assistants, and the school's supervising psychiatrist alleging that the work program imposed upon him was oppressive and not reasonably related, as it should have been, to a therapeutic and/or cost-saving purpose. The lower court held against the plaintiff on a motion for summary judgment, grounding its decision on official immunity. The Second Circuit reversed and remanded, stating:

"To hold that all state officials in suits brought under § 1983 enjoy an immunity similar to that they might enjoy in suits brought under state law 'would practically constitute a judicial repeal of the Civil Rights Acts.' * * * Furthermore and perhaps more basically, the purpose of § 1983 as well as other Civil Rights provisions is to provide a federal remedy for the deprivation of federally guar-

9. *Delaney* was an unusual case, and may, therefore, not be good authority on this issue. In that case, the warden was sued because plaintiff was being detained pursuant to an invalid judgment. Clearly, this contention affords no basis for suing the warden. The cases of Rhodes v. Meyer, 225 F.Supp. 80 (D.Neb.1963) and Rhodes v. Van Steenberg, 225 F.Supp. 113 (D.Neb.1963) may be in agreement with *Delaney*, although those cases are unclear on this point. Here too plaintiff's claim was of a bizarre nature, thus derogating from whatever import the holdings on the immunity issue may have.

anteed rights in order to enforce more perfectly federal limitations on unconstitutional state action. To hold all state officers immune from suit would very largely frustrate the salutary purpose of this provision." Id. 355 F.2d at 133.[10]

The quoted passage, although on its face appearing more qualified than my interpretation, may not really be so. The court, in holding that a director and his assistants, and particularly a state-employed psychiatrist, are not immune from liability for acts of a purely supervisory nature, goes further than any previous case.

Since it is the court's belief in the instant case that defendants may be sued, if they have deprived Roberts of a right protected by the Constitution, it becomes necessary to determine whether plaintiff has stated a claim under the second aspect of section 1983, "deprivation * * * of a right guaranteed by the Fourteenth Amendment." Roberts v. Trapnell, supra, 213 F.Supp. at 50–51. With regard to claims of prisoners, courts have most often pointed to the statement in Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948):

> "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the consideratons underlying our penal system." Id. 334 U.S. at 285, 68 S.Ct. at 1060.

In the instant case, the issue, viewed in that context, is whether the retraction involved, to wit, the denial of the right to freely publish and circulate material advocating a demonstration, can be said to be justifiable.

The rule that federal courts do not intervene in matters involving prison discipline is, as suggested by Price v. Johnston, supra, subject to limitation. What is needed to overcome the prison-

discipline defense has been stated in various ways by federal courts: "deprivation of a constitutional right" (United States ex rel. Cleggett v. Pate, 229 F. Supp. 818, 819 (N.D.Ill.1964)); "exceptional circumstances" (Walker v. Pate, 356 F.2d 502, 504 (7th Cir. 1966), United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir. 1964), Austin v. Harris, 226 F.Supp. 304, 307 and 309 (W.D. Mo.1964)); if the acts of prison officials are not "reasonably necessary to effectuate the purposes of imprisonment" (Kelly v. Dowd, 140 F.2d 81, 83 (7th Cir. 1944), cert. denied, 321 U.S. 783, 64 S.Ct. 639, 88 L.Ed. 1075 (1944)); "violation of a legal right or an abuse of discretion by prison officials" (Fulwood v. Clemmer, 206 F.Supp. 370, 375 (D.D.C.1962)); "extreme" circumstances (Lee v. Tahash, 352 F.2d 970, 971 (7th Cir. 1965), Childs v. Pegelow, 321 F.2d 487, 489 (4th Cir. 1963), cert. denied, 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964)); "[o]nly in a rare and exceptional situation" (Carey v. Settle, 351 F.2d 483, 485 (7th Cir. 1965), Harris v. Settle, 322 F.2d 908, 910 (7th Cir. 1965)); unreasonable regulations (United States ex rel. Morris v. Radio Station WENR, 209 F.2d 105, 107 (7th Cir. 1953), Lockhart v. Prasse, 250 F.Supp. 529, 531 (E.D.Pa.1965)). The difficulty of securing relief under the Civil Rights Act for alleged violations by prison authorities has recently been highlighted by the pronouncement that

> "[p]rison officials must have wide discretion in the promulgation of rules to govern the inmates, even to the point of denying basic constitutional rights."

United States ex rel. Henson v. Myers, 244 F.Supp. 826, 827 (E.D.Pa.1965). Accord, Sostre v. McGinnis, 334 F.2d 906, 908 (2d Cir. 1964), cert. denied 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96

---

10. The Maryland courts are also unwilling to accept a blanket immunity for state officials. "[W]hen a public officer goes outside the scope of his authority or duty he is not entitled to protection because of his office, but is liable for his acts like any private individual." 17 M.L.E. Officers .§ 64 (1961). See Eliason v. Funk, 233 Md. 351, 196 A.2d 887 (1964); Accord, Selico v. Jackson, supra, 300 F.2d at 478.

(1964). "No romantic or sentimental view of constitutional rights or of religion should induce a court to interfere with the necessary disciplinary regime [regimen?] established by the prison officials." Also in accord is Pierce v. La Vallee, 212 F.Supp. 865, 869 (N.D. N.Y.1962), aff'd 319 F.2d 844 (2d Cir. 1963), lower court affirming its original result on remand from 293 F.2d 233 (2d Cir. 1961). These authorities demonstrate that there has been little, if any, change in policy since 1962 when it was stated that "a study of the cases involving alleged mistreatment indicates that the courts have been so influenced by the dogma of the independence of prison authorities that judicial intervention has been limited to the extreme situation." Comment, Constitutional Rights of Prisoners: The Developing Law, 110 U.Pa. L.Rev. 985, 986–7 (1962).

The role of the federal courts in articulating the rights of prisoners is a difficult one. The courts have approached this problem by first recognizing the rights afforded all citizens under the Constitution, and then, in dealing specifically with rights of prisoners, removing some of these rights completely and others to a limited extent. In expressing the problems involved in this type of inquiry, one court has recently pinpointed the dilemma faced by federal courts:

> "Prison discipline *is* essential and certain rights *must* be curtailed in order to achieve it. But somewhere alone [sic] the line there exists a still finer line that separates mere matters of discipline from arbitrary and capricious disregard of human rights. It is this line for which federal courts must diligently search while treading about in the twilight zone that separates interference with a state's autonomy in policing its own penal system from the enforcement of federally guaranteed rights." United States ex rel. Wakeley v. Pennsylvania, 247 F.Supp. 7, 12 (E. D.Pa.1965).

This "twilight zone" has also been described as a "vast no man's land" "in between the constitutional rights of a prisoner on the one hand and the disciplinary rights of the authorities on the other hand." Beckett v. Kearney, 247 F.Supp. 219, 220 (N.D.Ga.1965).

Thus, it becomes important to determine whether there is a right to free speech within the prison walls; and if so, then, to what extent it may be curtailed. With reference to defendants, the issue is whether the disciplinary rules promulgated by them in restriction of speech are reasonable.

The court has not been provided with a copy of the circular distributed by Roberts, but accepts his characterization that the material urged a demonstration to protest "mistreatment, inequities, and criminal neglect by State correctional officials and civil personnel" (quoting from the complaint). The court also accepts Roberts' statement that the inmates participated enthusiastically in the demonstration, but is unwilling to infer that this large-scale participation evidences the justifiability of their grievances. In any event, the issue again is whether the defendants were justified in imposing restrictions on this type of speech. The determination of this issue is not dependent upon the court's evaluation of the motives that gave rise to the speech. Courts cannot engage in that kind of evaluation.[11]

In non-prison situations, courts have often curtailed the unbridled exercise of speech. The usual reason offered is that such speech presents a "clear and present danger" that undesirable consequences will ensue. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470. More particularly, it has been said that

---

11. Aside from the fact that motive is irrelevant to the issue of free speech, imagine the consternation that would envelop a court if it were required to become embroiled in a controversy involving the justification of Black Muslim ill feeling toward the white man. See Fulwood v. Clemmer, 206 F.Supp. 370, 373 (D.D.C.1962).

"[t]he question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that * * * [the State] has a right to prevent." Gitlow v. People of State of New York, 268 U.S. 652, 672–673, 45 S.Ct. 625, 632, 69 L.Ed. 1138 (1925) (dissenting opinion of J. Holmes) (paraphrasing Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249 (1918)).

The framework in which the law views the restraint of the free exercise of speech was established by the Supreme Court in a series of cases beginning with *Schenck,* supra. In *Gitlow,* supra, the Court held:

"It is a fundamental principle, long established, that the freedom of speech and of the press which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom." Id. 268 U.S. at 666, 45 S.Ct. at 630.

Elaborating on the freedom to exercise First Amendment rights, Justice Brandeis, concurring in Whitney v. People of State of California, 274 U.S. 357, 373, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927) wrote:

"But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction proposed is required in order to protect the state from destruction or from serious injury, political, economic or moral. That the necessity which is essential to a valid restriction does not exist unless speech would produce, or is intended to produce, a clear and imminent danger of some substantive evil which the state constitutionally may seek to prevent has been settled."

Since certain restraints are imposed upon those who are not incarcerated, surely, those who are confined must also suffer at least the same restraint. But because of the Supreme Court's statement in Price v. Johnston, supra, that incarceration carries with it the necessary "retraction" of certain rights (Id. 334 U.S. at 285, 68 S.Ct. at 1060), it would appear that the rights of prisoners are even more retracted than the already partially-curtailed rights of the unconfined. So, if speech is restrainable outside prison walls, it may be restrainable here, and, according to Price v. Johnston to a greater extent than the restraint on the free public. Accord, 75 Harv.L.Rev. 837, 839 (1962):

"[P]rison administration ordinarily demands that rights to speech and assembly, guaranteed to members of free society by the first and fourteenth amendments, be sharply curtailed."

Two recent cases are particularly pertinent on the issue of the prisoners' right to utter their views and the extent thereof.

In Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962), petitioner sought a writ of mandamus or, in the alternative, a writ of habeas corpus. The respondent was the Director of the District of Columbia Department of Correction. The petition relates to various deprivations concerning Fulwood's practice of the Muslim faith while incarcerated at Lorton Reformatory, Lorton, Virginia. One alleged deprivation was the refusal of prison authorities at Lorton to allow Black Muslim inmates to hold religious services.

Despite this directive, Muslims had been meeting informally in the recreation areas of the prison. On May 25, 1960, petitioner preached for twenty minutes to fifteen inmates, who had congregated by themselves in a portion of the area, but he was heard by many prisoners not in the immediate vicinity of the speech. At the trial, petitioner conceded that in his speech, he branded the white race as liars, thieves, and murderers, said that they could not be trust-

ed, and expressed regret that the Negro had "'fought for the white man in the war.'" Id. at 377.

The prison authorities characterized the speech as a "demonstration" or "disturbance" that tends to breach the peace. As such, it is subject to punishment. The court agreed with this determination. It thereby curtailed speech which tended to incite, even though no actual breach of peace resulted.

A more recent case is McCloskey v. State of Maryland, 337 F.2d 72 (4th Cir. 1964). There the inmate wished to correspond with Maryland's congressmen, senators, and state legislators to disseminate his anti-Semitic views.[12] The court forbade the use of the mails for this purpose, holding:

"A propagandist has no judicially enforceable right to propagandize within the prison walls, whether his propaganda be directed to other inmates or to outsiders." Id. at 74.

Like thoughts were expressed by the Supreme Court in upholding a state statute under which a protesting street-corner "orator" was convicted.

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.

It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.'" Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

In the instant case, I feel that Roberts has no judicially enforceable right to advocate open defiance of authority within the prison walls. The fact that so many inmates followed his request and demonstrated does not indicate, contrary to what Roberts would have the court believe, that his complaints are meritorious. It is more likely that Roberts appealed to those prisoners seeking the slightest pretext for demonstrating against their confinement. If the grievances are just, the courts will, as has been seen, furnish redress. But Supreme Court statements to the effect that there is no absolute right to freedom of speech means that attempts to speak in a milieu where such speech may incite an insurrection against the authorities must be tempered. Prison authorities cannot be expected to permit such conditions in the name of free

12. Normally, courts do uphold the right to censor and limit the correspondence of inmates. Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965); Pope v. Daggett, 350 F.2d 296 (10th Cir. 1965); Kirby v. Thomas, 336 F.2d 462 (6th Cir. 1964); United States ex rel. Henson v. Myers, 244 F.Supp. 826 (E.D.Pa.1965); Barber v. Page, 239 F.Supp. 265 (E.D.Okl.1965), reversed on other grounds, 355 F.2d 171 (10th Cir. 1965). Cf. United States ex rel. Gabor v. Myers, 237 F.Supp. 852 (E.D.Pa.1965), where relator was awarded summary judgment after he alleged and the state admitted that prison authorities interdicted his sending and receiving letters written in Hungarian, that

his only living relative lived in Hungary, and that a translator was available at the prison. Also, a hypothetical situation was posed in Lee v. Tahash, supra, 352 F.2d at 972 where the court states, "It will not ordinarily be possible to bring the actions of prison officials as to correspondence-privilege into this category of unlawful administration. Conceivably, however, in some situation such as serious or fatal family illness emotionally affecting a prisoner, there could be refusal or restriction as to correspondence which would be regarded by some courts as shocking to general conscience and intolerable in fundamental fairness."

speech. In a prison environment, where the climate tends to be more volatile than on the streets, strong restraints and heavy penalties are in order.

## PUNISHMENT

▮▮▮ Punishment of prisoners, like other facets of prison administration, is ordinarily not subject to review by federal courts. This reluctance extends to complaints of severity of solitary confinement brought under the Civil Rights Act. United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir. 1964), cert. denied 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277; Williams v. Wilkins, 315 F.2d 396 (2d Cir. 1963), cert. denied 375 U.S. 852, 84 S.Ct. 112, 11 L.Ed.2d 79; Roberts v. Barbosa, 227 F.Supp. 20 (S.D.Cal.1964); Ruark v. Schooley, 211 F.Supp. 921 (D.Col.1962); Blythe v. Ellis, 194 F.Supp. 139 (S.D. Tex.1961). Most cases, however, recognize the fact that exceptional circumstances may warrant the intervention of a court into these matters. E. g. United States ex rel. Knight v. Ragen, supra; Kostal v. Tinsley, 337 F.2d 845 (10th Cir. 1964), cert. denied 380 U.S. 985, 85 S.Ct. 1354, 14 L.Ed.2d 277 (1965).[13]

Such circumstances were found not to be present in two of the above cases, *Ruark*, supra, and *Blythe*, supra, where the punishment was quite severe. In *Ruark*, plaintiffs alleged the deprivation of food, water, and toilet paper for a period of fifty-two hours. This allegation was held not to have stated a claim under the Civil Rights Act, and, consequently, the complaint was dismissed on defendants' motion. In *Blythe*, plaintiff underwent surgery and nineteen days later, while allegedly still weak from the operation, was placed in solitary confinement. He claims that the cell was detrimental to his health, that it was subject to frequent flooding due to faulty plumbing, and that sickness, which led to the need for further surgery, resulted. The court considered these allegations as matters of internal discipline and held that plaintiff had failed to state a cause of action.

There are, on the other hand, several cases where courts have found that the punishment was so harsh and unjustifiable as to be considered in violation of the Constitution or otherwise unwarranted. In United States ex rel. Cleggett v. Pate, 229 F.Supp. 818 (N.D.Ill.1964), relief was granted under the Civil Rights Act, because the period of isolation imposed upon plaintiff was extended due to the pendency of that action. The court found that this punishment restricted unhampered access to the courts and thus deprived Cleggett of his constitutional rights. In *Fulwood*, which was not a Civil Rights Act case, the court ordered petitioner removed from solitary confinement, where he had been for two years, and returned to the general prison population. This holding was made despite the court's determination that petitioner had violated a prison rule and, thus, was subject to punishment. The court felt that the punishment received was not "reasonably related to his infraction of the mentioned prison rule." Id. 206 F.Supp. at 377.

13. In both of these cases, however, relief was denied. But in United States ex rel. Knight v. Ragen, a hearing had been held in the lower court with one of the issues being whether plaintiff had been denied essential medical care. The lower court found that he had not been and the Second Circuit held that this finding was supported by the record. The issue of deprivation of medical care has received more favorable consideration than any other as a basis for overcoming the usual defense that these matters involve questions of internal administration, and thus are not subject to judicial review. E. g. Edwards v. Duncan, 355 F.2d 993 (4th Cir. 1966); Hirons v. Director, Patuxent Institution, 351 F. 2d 613 (4th Cir. 1965); Coleman v. Johnston, 247 F.2d 273 (7th Cir. 1957); Haigh v. Snidow, 231 F.Supp. 324 (S.D. Cal.1964); Redding v. Pate, 220 F.Supp. 124 (N.D.Ill.1963). Compare pp. 425–427, supra. However, as Knight indicates, the allegation does not insure success. Also, in United States ex rel. Lawrence v. Ragen, 323 F.2d 410 (7th Cir. 1963), plaintiff was held not to have shown inadequacy of medical care.

In the instant case, it cannot be said that the punishment was unreasonable. Twenty-seven hours in isolation and, later, sixteen days in semi-segregation under the conditions alleged do not indicate privations of constitutional dimension. In my opinion, Roberts' punishment was milder than that which the courts supported in *Ruark* and *Blythe*. The torturous two years endured by Fulwood is in no way comparable to the treatment accorded Roberts. Roberts' punishment was not so exceptional or extreme in nature as to override the defense that matters of prison discipline are within the discretion of prison officials. See Sostre v. McGinnis, 334 F.2d 906 (2d Cir. 1964), cert. denied 379 U.S. 892, 85 S.Ct. 168. This means also that the punishment cannot be classified as cruel or inhuman so as to bring it within the prohibitions of the Eighth and Fourteenth Amendments, and ultimately within the gamut of section 1983. See Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965). In Roberts v. Pegelow, 313 F.2d 548, 550 (4th Cir. 1963), the Fourth Circuit stated:

"So long as the punishment imposed for an infraction of the rules is not so unreasonable as to be characterized as vindictive, cruel or inhuman, there is no right of judicial review of it."

I believe that the punishment involved in this case is not subject to judicial review.

## TRANSFER

Roberts contests the validity of his transfer to the Maryland House of Correction. He claims that he was not granted a hearing prior to the transfer as are other prisoners, and that this omission, allegedly brought about by defendants conspiring among themselves, deprived him of due process and equal protection of the laws. In addition, he questions the constitutionality of the statute that authorized the Commissioner of Correction to transfer him to an institution different from the one to which he was originally sentenced by a judge. Md.Code Ann. art. 27, § 690(a) (Supp. 1965). Finally, Roberts seems to allege that the Commissioner of Correction did not issue a warrant directing transfer as the statute requires.

The statute discussed provides:

"Whenever the Commissioner of Correction determines that prison discipline will be furthered by transferring male prisoners among the institutions for males under its jurisdiction, and issues his warrant to the warden and superintendent of wardens of said institution directing such transfer, the sentence of the court shall operate to authorize such transfer by virtue hereof. The power of transfer conferred upon the Commissioner of Correction by this section authorizes the Commissioner of Correction to transfer any person confined in any of said institutions to any other of said institutions at any time the said Commissioner of Correction determines that such transfer will improve discipline or aid in the safekeeping, treatment, training, employment, or rehabilitation of such person." Md.Code Ann. art. 27, § 690(a) (Supp.1965).

The policy outlined in the statute was upheld in Ortega v. Patterson, 354 F.2d 691 (10th Cir. 1965).

In the case of Lewis v. Gladden, 230 F.Supp. 786 (D.Or.1964), petitioner contended that his transfer deprived him of due process and equal protection of the laws, because the new institution was not the one to which he was originally sentenced and conditions there were more burdensome than existed at the first. In dismissing the petition, the court stated:

"It is argued that due process is violated by such a transfer in a non-judicial proceeding. That is to say, the transfer is in the nature of passing a separate sentence on the petitioner by an administrative group. Essentially the same argument is made on the claim that petitioner had a vested right to remain in the institution to which he was originally committed. In my view, all of these arguments and claims

are without substance. Petitioner must concede that the Legislature had power to create both institutions. The law permitting the transfer from one institution to the other was in full force and effect at the time petitioner entered his plea of guilty and at the time he was sentenced to the correctional institution. It is fundamental that such law was read into and became part of the judgment and sentence. Consequently, both the Judge and petitioner were conclusively presumed to know that petitioner might be transferred to the penitentiary, even though he was sentenced to the other institution. It requires no citation of authority to state that the administration of penal institutions is for the executive, rather than the judicial, branch of our Government. Apart from due process considerations, the Federal Courts have no power to control or supervise state prison regulations or practices." Id. at 787–788.

The court agrees with this opinion and holds that the transfer of Roberts did not deprive him of due process.

Nor does the absence of a hearing state a cause of action for the denial of equal protection of the laws. Assuming that hearings are granted prior to transfer,[14] there is sufficient cause to justify the bypassing of that procedure in this instance. Roberts is unlike the inmate transferred due to overcrowded conditions, Lewis v. Gladden, supra, or because he may be more safely cared for or trained in another institution, Bell v. Warden, 207 Md. 618, 113 A.2d 482 (1955), cert. denied Bell v. State of Maryland, 350 U.S. 852, 76 S.Ct. 94, 100 L.Ed. 758. That is the type of prisoner for whose protection this statute appears to be intended.

■ An explosive situation ignited, at least in part, by Roberts demanded his immediate removal from the general prison population and even from the prison itself. Such a deviation from normal procedure does not violate the equal protection clause when that deviation can be justified as here, by the exigencies of the situation.[15]

"The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." Tigner v. State of Texas, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940).

"For a State is not constrained in the exercise of its police power to ignore experience which marks a class of offenders or a family of offenses for special treatment. Nor is it prevented by the equal protection clause from confining 'its restrictions to those classes of cases where the need is deemed to be clearest.'" Skinner v. State of Oklahoma, 316 U.S. 535, 540, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942).

■ What the court considers to be plaintiff's third contention with respect to the transfer, that a warrant was not issued directing the transfer, also raises an equal protection question. The statute states that, prior to transfer, the Commissioner of Correction is to issue his warrant to the "warden and superintendent of wardens of said institution directing such transfer." Md.Code Ann. art. 27, § 690(a) (Supp.1965). It is not clear from this wording whether the warrant is to be directed to the warden of the transferring institution or the one to which the inmate is to be transferred. But assuming that the warrant is intended for the warden of the latter institution, the failure to issue it was, under the circumstances, permissible. The same considerations dictate this determination as were applicable in Rob-

---

14. The statute permits transfer whenever "prison discipline will be furthered" and does not indicate that a hearing is required.

15. There have been several cases where alleged distinctions between inmates were held to have stated causes of action. E. g. Richey v. Wilkins, 335 F.2d 1 (2d Cir. 1964); Bolden v. Pegelow, 329 F.2d 95 (4th Cir. 1964); Pierce v. LaVallee, 293 F.2d 233 (2d Cir. 1961); Banks v. Havener, 234 F.Supp. 27 (E.D.Va.1964).

erts' previous contention. The importance of removing Roberts expeditiously justified the forsaking of this formality.

"The contention that illegal conduct on the part of the State's officers deprived petitioner of the equal protection of the laws hardly needs notice. The claim is that where offenders violate the law so that some defendants are treated as was petitioner, and others are treated as the law requires, inequality and discrimination results which denies equal protection. The contention is frivolous." Lisenba v. People of State of California, 314 U.S. 219, 226, 62 S.Ct. 280, 285, 86 L.Ed. 166 (1941).

### DENIAL OF LEGAL MATERIALS

Roberts has recently filed what he terms a "Petition For Recovery of Personal Property." The State has answered with a "Supplemental Motion to Dismiss." The personal property which he alleges is being held from him includes copies of his various court petitions, court decisions, correspondence with attorneys and courts, and volumes of cases, statutes and treatise material.

 It is important to note that Roberts does not allege that he has been denied access to the courts, although he does claim an "immediate and urgent need for the legal material above stated to effect his remedy in the federal courts." (Quoting from the supplementary petition.) The cases indicate that the interdiction of access to the courts must be alleged in order for the denial of legal materials to be considered as a deprivation of a constitutional right.

"If the purpose [of regulations restricting inmate use of legal materials] was not to hamper inmates in gaining access to the courts with regard to their respective criminal matters, and if the regulations and practices do not interfere with such reasonable access, our inquiry is at an end. The fact, if it be a fact, that access could have been further facilitated without impairing effective prison administration is likewise immaterial." Hatfield

v. Bailleaux, 290 F.2d 632, 640 (9th Cir. 1961), cert. denied 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59.

Accord, United States ex rel. Henson v. Myers, 244 F.Supp. 826 (E.D.Pa.1965). Roberts does not state that he is being denied a means to the court but rather a means to "effect his remedy." Such a claim, in my judgment, does not present a constitutional issue.

 The right to petition or correspond with a court does not include a right to be furnished with an extensive collection of legal materials. Such a collection either in one's own cell or in the prison library will encourage "fishing expeditions" in which an inmate seeks out cases where the allegations made received favorable consideration and adopts these allegations as his own. By denying Roberts this opportunity to raise spurious claims, the prison authorities are perhaps hindering his access to a "remedy." Again, such a hindrance is justifiable.

 Prisons are not intended, nor should they be permitted, to serve the purpose of providing inmates with information about methods of securing release therefrom. As this case has demonstrated, if Roberts does set forth allegations, which he does not know how to frame in terms of constitutional deprivations, this court will frame them for him. That arrangement is far superior to the "fishing expedition" system that many inmates would prefer.

That reasonable restrictions are necessary was pointed out in Lee v. Tahash, 352 F.2d 970, 973–974 (8th Cir. 1965),

"Prison regulations are not required to provide prisoners with the time, the correspondence privileges, the materials or other facilities they desire for the special purpose of trying to find some way of making attack upon the presumptively valid judgments against them. A prisoner who believes that he has an existing meritorious basis for attacking the validity of his sentence is entitled to the opportunity of making legal assertion of it. But federal

law does not create any hunting right or license in penal institutions."

In *Hatfield, supra*, the court upheld regulations which forbade all legal materials in the cell, which allowed correspondence with courts, judges, and attorneys, but prevented the retention of any correspondence from these sources that contained citations to legal authorities. Inmates could not prepare legal documents in their cells but had to do so in the library. Also, they were prevented from purchasing or receiving any legal material except from the publisher. Thus, no gifts of books were permissible. In upholding the regulations, the court declared:

"State authorities have no obligation under the federal constitution to provide library facilities and an opportunity for their use to enable an inmate to search for legal loopholes in the judgment and sentence under which he is held, or to perform services which only a lawyer is trained to perform. All inmates are presumed to be confined under valid judgments and sentences. If an inmate believes he has a meritorious reason for attacking his, he must be given an opportunity to do so. But he has no due process right to spend his prison time or utilize prison facilities in an effort to discover a ground for overturning a presumptively valid judgment." Hatfield v. Bailleaux, supra, 290 F.2d at 640–641.[16]

One of the bases for upholding regulations such as those found in *Hatfield* was stated in Siegel v. Ragen, 180 F.2d 785, 788 (7th Cir. 1950), cert. denied 339 U.S. 990, 70 S.Ct. 1015, 94 L.Ed. 1391.

"Obviously the right to practice law or to maintain a law department within the confines of a state penitentiary is not a right secured by the Constitution of the United States."

Accord, Williams v. Wilkins, 315 F.2d 396 (2d Cir. 1963), cert. denied 375 U.S. 852, 84 S.Ct. 112; Gaito v. Prasse, 312 F.2d 169 (3d Cir. 1963), cert. denied 374 U.S. 816, 83 S.Ct. 1711; United States ex rel. Wakeley v. Pennsylvania, 247 F.Supp. 7 (E.D.Pa.1965); Edmundson v. Harris, 239 F.Supp. 359 (W.D.Mo. 1965).

■■ But assuming that the denial of a means of effecting a remedy is equivalent to a denial of access, still Roberts would not be entitled to relief. The court in *Wakeley, supra*, indicated that the question of "[w]hether reasonable access is being provided must in the end depend upon the circumstances of each case." Id. 247 F.Supp. at 13. Accord, Hatfield v. Bailleaux, supra, 290 F.2d at 637. In this case, the voluminous mass of petitions and letters bears witness to the fact that Roberts has not been impeded or discouraged by whatever regulations were in effect. His eleven years of correspondence with the court, during which time he has raised many contentions, manifest a sufficient familiarity with state and federal procedures as well as those types of claims which have supported relief in other cases to justify the court's belief that absence of these materials, under these circumstances, is not depriving Roberts of access to the courts.[17] Again, the court will assist an inmate, if it appears that state authorities may have deprived

16. Other reasons commonly offered for restricting materials allowed in cells are that they present a fire hazard, Carey v. Settle, 351 F.2d 483 (8th Cir. 1965); United States ex rel. Lee v. Illinois, 343 F.2d 120 (7th Cir. 1965), and a desire not to encourage jailhouse lawyers who might "exploit and dominate weaker prisoners of inferior intelligence." Hatfield v. Bailleaux, supra, 290 F.2d at 639.

17. The quantity of opinions alone filed in Roberts' case is quite substantial.
State: Roberts v. Warden, 206 Md. 246, 111 A.2d 597 (1955) (habeas corpus—

appeal dismissed); Roberts v. Warden, 214 Md. 611, 135 A.2d 446 (1957), cert. denied *sub nom.* Roberts v. Pepersack, 355 U.S. 966, 78 S.Ct. 556, 2 L.Ed.2d 540 (1958) (habeas corpus—application for leave to appeal denied); Roberts v. Warden, 221 Md. 576, 155 A.2d 891 (1959), cert. denied *sub nom.* Roberts v. Pepersack, 362 U.S. 953, 80 S.Ct. 866, 4 L.Ed.2d 871 (1960) (denial of application for leave to appeal from a denial of petition filed under Post Conviction Procedure Act, Acts 1958, ch. 44, repealed and re-enacted with amendments,

him of constitutional rights, and he is unable to properly allege them.

This case is unlike United States ex rel. Mayberry v. Prasse, 225 F.Supp. 752 (E.D.Pa.1963), where the relator, who was comparatively inexperienced in rules and procedures of court, was thwarted in his attempts to obtain court rules, books, and legal opinions. The court granted relief holding that prison authorities were denying him access to the courts, and that he should be permitted to have in his possession at least the Pennsylvania Rules of Procedure.

Incidentally, there is on record, in the file, a letter addressed to Roberts from the acting warden of the Maryland House of Correction, dated April 5, 1966, which states that attempts are being made to locate these items, and that prison officials were under the impression that they had been returned to him. Thus, it seems that the deprivation, if it still exists, is not by design or due to a regulation but rather is an oversight on the part of the officials.

The Supreme Court has held that in order to state a claim of deprivation of equal protection, the act(s) of the state officer(s) must be deliberately intended to bring about that deprivation:

"The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. * * * But a discriminatory purpose is not

presumed * * *; there must be a showing of 'clear and intentional discrimination' * * *." Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944).

The *Snowden* decision raises interesting points, particularly in view of the decision in Monroe v. Pape, 265 U.S. 167, 81 S.Ct. 473 (1961), that negligent or unintentional deprivations of rights constitute sufficient grounds on which to base an action under section 1983. The Court in *Monroe* may not have intended its conclusion to encompass equal protection deprivations. In any event, this court will assume that the *Monroe* decision is that extensive; consequently, the court relies on its other conclusions to dismiss the complaint on this issue.

## RIGHT TO COUNSEL

■ Among the types of relief requested by Roberts is the appointment of counsel to prosecute this action. Authorities indicate that the appointment of counsel in cases of this nature is a privilege and not a right, and thus involves the exercise of the court's discretion. United States ex rel. Gardner v. Madden, 352 F.2d 792 (9th Cir. 1965); Hatfield v. Bailleaux, supra; Temple v. Pergament, 235 F.Supp. 242 (D.N.J. 1964); Sewell v. Kennedy, 222 F.Supp. 15 (E.D.Va.1963); Jefferson v. Heinze, 201 F.Supp. 606 (N.D.Cal.1962). In discussing their discretionary powers, courts have stated that counsel should be appointed in civil cases only in "exceptional cases," United States ex rel. Gardner v. Madden, supra, 352 F.2d at 794, or under "unusual circumstances," Jefferson

Acts 1959, ch. 429, repealed in part and re-enacted with amendments by subsequent Acts. Now, Md.Code Ann. art. 27, §§ 645 A, E, I, J.) Roberts v. Warden, 227 Md. 648, 175 A.2d (1961) (post-conviction petition—application for leave to appeal denied); Roberts v. Warden, Criminal Court of Baltimore City, No. 058596 (1963), cert. denied 375 U.S. 886, 84 S.Ct. 161 (1963) (state habeas corpus petition denied). Presently, Roberts has a post-conviction petition pending in the Criminal Court of Baltimore City.
Federal: Roberts v. Pepersack, D.Md., Civil No. 10479, April 8, 1958 (federal

habeas corpus denied); Roberts v. Pepersack, 190 F.Supp. 578 (D.Md.1960) (federal habeas corpus denied), aff'd 286 F.2d 635 (1960); Roberts v. Pepersack, D. Md., Civil No. 10479, June 22, 1962 (federal habeas corpus denied), aff'd 4th Cir., July 26, 1962; Roberts v. Warden, D. Md., Civil No. 10479, June 10, 1964 (federal habeas corpus denied), aff'd 4th Cir., No. 9663, September 25, 1964; Roberts v. Warden, D.Md., Civil No. 10479, June 24, 1964 (supplemental memorandum); Roberts v. Warden, D.Md., Civil No. 10479, July 9, 1964 (petition for rehearing denied).

v. Heinze, supra, 201 F.Supp. at 607. Accord, Weller v. Dickson, 314 F.2d 598 (9th Cir. 1963), cert. denied Weller v. California, 383 U.S. 953, 86 S.Ct. 1217, 16 L.Ed.2d 215 (1966). In Temple v. Pergament, supra, 235 F.Supp. at 243, the court declared that "in a civil proceeding, if the complaint is patently without merit, no need for the appointment of legal counsel would exist."

██ In the instant case, the court has spared no effort to assist the plaintiff. It has framed his allegations in terms of the statute which is most favorable to his situation and has, to his benefit, ignored his requests for relief under other, less helpful statutes. In addition, the court has interpreted his allegations and rephrased them in an attempt to bring his allegations within the ambit of constitutional protection. At times (e. g., p. 433, supra), the court has even phrased the allegations in terms of constitutionally-guaranteed rights of which Roberts has perhaps never heard. Still, despite this extremely liberal interpretation, Roberts' complaint remains insufficient. It is the court's belief that no reasonable treatment of the facts could correct the manifest insufficiency of this complaint. To appoint an attorney where both the complaint on its face and the court's liberal interpretation of it have failed to produce a claim which may possibly be of merit, would work an injustice to the attorney.

In addition, the appointment of counsel under these circumstances would result in the burdening of the court with petitions from prisoners who would come to realize that such petitions practically guarantee the appointment of counsel. Petitions would be filed for the sole purpose of securing appointed counsel who, in the mind of the inmate, would explain the law to him, the inmate's hope being the acquiring of a sufficient fund of information from which he might draw in inventing allegations that would meet the requirements of the law. This court wishes to encourage neither such optimism nor such a practice.

The case of Weller v. Dickson, 314 F.2d 598 (9th Cir. 1963), cert. denied 383 U.S. 953, 86 S.Ct. 1217 (1966), aptly notes the apprehension felt by the courts:

"[I]f actions of this nature, brought by incarcerated prisoners, are to be indiscriminately permitted they could seriously disrupt prison discipline. Moreover, they would give prisoners a field day in the courts, at public expense." Id. at 601.

In *Weller,* the Ninth Circuit affirmed the denial by the district court of petitions requesting permission to file civil actions in forma pauperis. The court did not specifically mention the appointment of counsel issue, but it referred to proceedings in forma pauperis, which under 28 U.S.C. § 1915 include the appointment of counsel for indigents.

A very thorough discussion and a substantial list of authorities on this issue are found in Jefferson v. Heinze, supra. There, plaintiff was complaining of racial segregation and discrimination at his prison. Action was brought under the Federal Civil Rights Act, 42 U.S.C. § 1981 et seq. In denying counsel to the plaintiff, the court distinguished civil cases from criminal cases protected under the Sixth Amendment to the United States Constitution. It went on to say:

"In appropriate civil cases, the appointment of counsel well may be proper and desirable, both for the protection of a litigant and the assistance of the Court, but a Court is not required to appoint an attorney for such purposes * * *. Absent unusual circumstances, an indigent civil litigant is not entitled, as a matter of right, to have an attorney assigned to assist him with his litigation * * *. The requisite unusual circumstances have not been made apparent in this proceeding. This is an adequate reason for a refusal to appoint counsel to represent plaintiff.

"Furthermore, in a civil proceeding, such as this one, there is no possible need for the assignment of counsel if it is patent to the Court that the proceeding does not have at least ostensible merit." Id. 201 F.Supp. at 607.

In further support of the conclusion that the appointment of counsel is not warranted here is the statement in Smart v. Heinze, 347 F.2d 114 (9th Cir. 1965), cert. denied 382 U.S. 896, 86 S.Ct. 192, 15 L.Ed.2d 153 (1965), in which the Ninth Circuit, again referring to proceedings under 28 U.S.C. § 1915, held:

"The latitude of discretion accorded the ruling of the district court in such matters is especially broad in civil actions [brought] by prisoners against their wardens and other officials connected with the institution in which they are incarcerated." Id. at 116.

One judge has gone so far as to say that this latitude is broad enough to sustain the denial of counsel even when "the complaint does state a claim for relief, if the court is of the opinion that the plaintiff's chances of ultimate success are slight." Weller v. Dickson, supra, 314 F.2d at 604 (Duniway, J., concurring opinion).

Thus, it is apparent that plaintiff's request for appointment of counsel should be denied.

From the foregoing, it follows that defendants' motion to dismiss must be, and it is hereby, granted.